IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
December 13, 2012 Session

## DESIREE M. BEYER v. ERIK A. BEYER

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-004237-08      Robert L. Childers, Judge**

**No. W2011-00502-COA-R3-CV - Filed April 5, 2013**

This appeal arises from a prolonged divorce action. On appeal, Father challenges the trial court's determinations regarding parenting time, child support, alimony, and the division of the marital estate. Father further challenges the trial court's decision finding him in both civil and criminal contempt. After thoroughly reviewing the record, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part, Reversed in part, Vacated in part and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Michael A. Carter, Milan, Tennessee, for the appellant, Erik A. Beyer.

Daniel Loyd Taylor and John N. Bean, Memphis, Tennessee, for the appellee, Desiree M. Beyer.

## OPINION

### I. Background and Procedural History

On June 11, 1994, Desiree M. Beyer ("Mother") and Erik A. Beyer ("Father") were married. Father graduated from medical school at the University of Tennessee in the summer of 1994, and thereafter began his career as a heart surgeon. Mother obtained a masters degree in marketing prior to the marriage, and later earned a degree in economics from Vanderbilt University in 1994. During the marriage, Mother gave birth to the parties' three daughters– Maria in 1997; Julia in 1999; and Isabella in 2004.

Upon graduating from medical school, Father accepted a general surgery residency at the University of Texas which required the parties to move to Houston, Texas. While living in Houston, Mother worked various jobs until she became pregnant with Julia in 1998. At that time, the parties decided that Mother would stay at home and care for the children. During his residency, Father often worked one hundred (100) hours or more each week, requiring him to stay at the hospital for several days at a time. In addition to caring for the children, Mother helped Father during his residency by bringing him changes of clothes to the hospital throughout the week. Since Father did not earn a substantial income during his residency, Mother's parents began assisting the parties financially in the amount of $1,500 per month.

In 2001, the parties moved to Cleveland, Ohio in order for Father to participate in a three-year residency in heart surgery. Before moving to Cleveland, Mother marketed and ultimately sold the parties' home through a for sale by owner process. In 2004, after Father completed his residency, Mother began searching for employment opportunities for Father. Throughout this process, Mother drafted and mailed cover letters and thank you notes, constructed Father's curriculum vitae, submitted multiple applications, and made phone calls before and after each of Father's interviews. Eventually, Father secured a position at a hospital in Belton, Texas based on Mother's efforts and her discovery of the job listing. As a result, in July 2004, the parties moved back to Texas. Again, before moving to Texas, Mother utilized the for sale by owner process and sold the condominium that the parties owned in Cleveland.

In 2007, the parties' relationship began to suffer after Mother confronted Father about a suspected affair. After initially denying any wrongdoing, Father eventually admitted to Mother that he was having an affair. Two days later, Father moved out of the marital residence. Thereafter, in January 2008, Mother moved with the parties' three children to her parents' home in Germantown, Tennessee. Shortly after moving to Tennessee, Mother met with Father's parents, who lived nearby in Memphis, and promised to maintain the relationship between them and their grandchildren despite the parties' marital issues.

Following the parties' separation, Father generally saw the children every other weekend when he would travel to Tennessee. From February 2008 to August 2008, the parties participated in marriage counseling and attempted reconciliation with the parties and their children living together in Texas. Despite Father's statements under oath that he did not contact his girlfriend during the attempted reconciliation with Mother, telephone records indicated that there were over three hundred (300) phone conversations between Father and his girlfriend during that period of time. In light of the parties' unsuccessful reconciliation, Mother filed her Complaint for Absolute Divorce in the Circuit Court of Shelby County on August 29, 2008. Father filed his Answer and Counter-Complaint on December 2, 2008, and

Mother filed an Answer on February 3, 2009. Thereafter, on February 12, 2009, the parties agreed to the entry of a Consent Order on Temporary Parenting, which provided Father with unrestricted and unsupervised parenting time through April 2009, but reserved subsequent parenting time for "future determination." On February 19, 2009, the parties agreed to the entry of a Consent Order on Temporary Support, which provided that Father would pay $4,100.00 per month as temporary child support and $2,500.00 as temporary alimony. The Consent Order on Temporary Support also provided that the children's private school tuition would be paid from the parties' savings account.

Throughout the litigation, numerous psychologists and counselors were involved in counseling the parties and their children. Dr. Jolene Bailey ("Dr. Bailey") and Dr. Amy Beebe ("Dr. Beebe"), both psychologists, provided counseling for the children. Dr. F. A. Steinberg ("Dr. Steinberg"), a forensic and clinical psychologist, was appointed by the trial court to conduct forensic psychological examinations on the parties. Dr. John Ciocca ("Dr. Ciocca"), a psychologist, participated in this matter as a co-family therapist with Dr. Beebe. Dr. William Bernet ("Dr. Bernet"), a psychiatrist, was hired by Father to conduct a psychiatric examination on him to determine if he had any mental disorders that may affect his parenting skills. Patricia Maynard ("Ms. Maynard"), a licensed professional counselor and director of the visitation services program at the Exchange Club Family Center, served as the visitation supervisor and the visitation facilitator for the parties. Lastly, Dr. John Hutson ("Dr. Hutson"), a psychologist, was appointed by the trial court as a parenting coordinator to work with Dr. Beebe and Dr. Ciocca.

The relationship between Father and the children deteriorated after the parties' separation. Father's relationship with the children suffered the most following instances where he became angry and aggressive with the children. For example, in the Spring of 2009, the children visited Father in Texas. During their stay, Maria and Julia discovered photographs and other items belonging to Father's girlfriend. Upset with their discovery, the children destroyed many of the items and took some of the photographs, which they showed to Mother when they returned home to Tennessee. In response, Father called Maria over the phone, interrogated and yelled at her for her actions, and at various times throughout the conversation, threatened to involve the police if she failed to tell the truth or hung up the phone.[1] Subsequently, during another visit, Father became angry with Julia for calling Mother on the phone. In response, as found by the trial court, Father dragged Julia across the floor, locked her in a closet, and gave her a book on parental alienation. Thereafter, the children frequently expressed their desires to Mother and their psychologists that they did not wish to see or communicate with Father.

---

[1]An audio recording and transcript of this conversation was included in the record.

On June 5, 2009, the trial court entered an Order on Hearing of April 3, 2009. The order provided, in part, as follows: (1) that the parties agreed to temporary possession of certain personal property and that no other personal property would be removed from storage by either party without a court order; (2) that Father was enjoined from making payments to his parents for repayment of loans owed to them; (3) the parties agreed to submit to psychological examinations; (4) the trial court denied Father's petition to dissolve an injunction prohibiting him from removing the children from Shelby County and prohibiting him from removing them from school; and (5) the trial court granted Mother's petition to indefinitely suspend Father's parenting time with Maria. Moreover, the trial court admonished Father that his relationship with his girlfriend had a negative impact on his relationship with the children and that he should give serious thought as to whether the relationship should continue. Despite the trial court's admonishment, Father introduced his girlfriend to Julia and Isabella over Mother's Day weekend less than two months later.

In August 2009, Father lost his job in Texas and remained unemployed for several months. Thereafter, in April 2010, Father accepted a position as a heart surgeon at a hospital in Jackson, Tennessee. Father currently resides in Jackson with his girlfriend and their child, who was born in December 2010.

On September 2, 2010, the Divorce Referee conducted a hearing in this matter. Following the hearing, the Divorce Referee concluded that Father should be required to pay $8,500 per month in temporary alimony, $4,100 as temporary child support, and Mother's attorney's fees of $13,935.33. The trial court agreed, and on November 15, 2010, ordered the same by entry of its Order on Divorce Referee Hearing.

Over the course of the litigation, Mother filed eight petitions for contempt against Father. The trial court found Father to be in civil contempt on the first four petitions for failing to pay private school tuition and associated fees, for removing personal property that was in storage, and for failing to pay temporary alimony and child support. Subsequently, after conducting a hearing in January 2011, the trial court entered an order in which it found that Father was not in contempt based on the fifth petition for allowing the parties' health insurance to lapse. The trial court, however, found Father in civil contempt on the sixth petition for removing furniture from storage, and in civil contempt on the seventh petition for failing to pay alimony, both in violation of the trial court's orders. Further, the trial court found Father in criminal contempt on the eighth petition for paying money to his parents for repayment of loans in violation of the trial court's order. The trial court ordered Father to jail and concluded that he could purge himself of civil contempt by paying $39,241.99 and by properly rearranging the furniture in storage. Although Father presented a personal check in the above amount to purge the civil contempt, the trial court refused to accept Father's check because it was not a certified check. As for the criminal contempt, the trial court

sentenced Father to ten days on nine counts and ordered the sentences to be served consecutively, for a total sentence of ninety (90) days. The trial court also ordered Father to pay Mother's attorney's fees for those contempt actions.

On February 9, 2011, after Father served three days in a Shelby County jail, the trial court entered an order directing that Father be released on his own recognizance pending the exhaustion of his appeal. On March 3, 2011, the trial court entered an order suspending the balance of Father's incarceration for criminal contempt contingent upon Father abiding by the trial court's orders. Thereafter, a trial on the divorce matter was held on February 21-23, 28, and March 1-3, 7- 9 and 18, 2011. On June 6, 2011, the trial court entered its Final Decree of Absolute Divorce and its Permanent Parenting Plan Order. In its Final Decree, the trial court concluded as follows:

1. [Father] has repeatedly been willfully untruthful and/or misleading in his sworn testimony before this Court on material matters. The Court invokes the maxim *falsus in uno falsus in omnibus* such that the Court disregards all of [Father]'s testimony that is contrary to [Mother]'s testimony.

2. [Mother] should be granted the divorce on the grounds of inappropriate marital conduct.

3. After considering all relevant factors set out in TCA Section 36-4-121, the Court makes a fair and equitable distribution of the parities' marital estate . . . . Each party will keep the furnishings and personal property currently in his or her possession. [Father] should be awarded the property that is currently in storage.

4. After considering TCA Section 36-6-106 and Section 36-6-404 the Court finds it is in the children's best interest to adopt [Mother]'s proposed Permanent Parenting Plan Order as an Order of the Court.

5. Pursuant to TCA Section 36-6-406, [Father] has engaged in a pattern of emotional abuse of the children, and has also engaged in conduct that created much of the children's unhappiness and distress and [Father] is unlikely to cease that pattern of conduct. [Father] refuses to accept that he alone is responsible for the estrangement from his daughters, and refuses to accept his daughters' perspective concerning his behavior, to the detriment of his relationship with his daughters.

7. [Father] should be required to participate in intensive individual therapy in

an effort to repair the relationship with his daughters. [Father]'s parenting time with his minor children will be restricted until he complies with the recommendations set out in the letter dated May 24, 2010 from Dr. Jolene Bailey and Dr. Amy Beebe.

8. Dr. John Hutson should be relieved from any further responsibility as parental coordinator.

9. [Father] allowed COBRA medical insurance coverage for [Mother] and the minor children to lapse during the marriage. [Father] should pay any uncovered medical bills of [Mother] and the minor children during the period of time when COBRA coverage had lapsed.

10. [Father] should reimburse [Mother] the amount of $11,783.02 for uncovered medical and psychological expenses that [Mother] paid for the minor children.

11. All of [Mother]'s interests in the family partnerships are her separate property because she received her interests by gift or inheritance. [Father] failed to meet his burden to prove that any portion of [Mother]'s interests in the family partnerships is marital property. Therefore, all of [Mother]'s interests in the family partnerships are her separate property.

12. [Mother] claims that [Father] dissipated marital assets by paying $81,000.00 to [his former attorney], paying his parents $27,143.00 after the divorce was filed for unsubstantiated, undocumented, alleged loans owed to his parents from before the marriage, and paying $50,300.00 in marital funds to his parent's in violation of a Court Order. [Mother] also claims that [Father] dissipated $45,000.00 from a savings account for which [Father] has not accounted, and $100,000.00 for an unreasonable expenditure for attorney fees. [Mother] has established a prima facie case that all of her claims of dissipation are valid and [Father] has failed to meet his burden to prove that the expenditures were appropriate. The Court finds that all of [Mother]'s claims of dissipation are valid.

13. After considering TCA Section 35-5-121 and all relevant factors, the Court finds that [Mother] is an economically disadvantaged spouse who cannot be rehabilitated to a point such that she can enjoy the same standard of living that [Father] will enjoy after the divorce. [Father] should pay alimony *in futuro* to [Mother] in the amount $8,500 per month until the parties' youngest child

graduates from high school. [Father] should pay his alimony obligation by wage assignment. [Father] should maintain life insurance on his life benefiting [sic] [Mother] in the amount of his maximum outstanding alimony obligation for so long as he has an alimony obligation. Said alimony shall be taxable to [Mother] and deductible by [Father].

14. [Father] has prolonged this litigation by changing attorneys numerous times, by seeking multiple continuances and, by his conduct, causing [Mother] to seek enforcement of the Court's Orders through multiple contempt petitions. [Father] has also paid the majority of his attorneys' fees from the marital estate. [Mother] incurred attorney fees of $413,625.79 in prosecuting and defending actions against [Father] and in support of herself and the minor children. [Father] has stipulated that the fees were reasonable. Therefore, [Father] shall be required to pay to [Mother] her attorney's fees in the amount of $413,625.79. Said fees shall be paid as alimony in solido, and in the nature of support.

In its Permanent Parenting Plan Order, the trial court adopted the therapeutic recommendations of Dr. Bailey and Dr. Beebe as set out in a letter dated May 24, 2010. This letter provided in part that:

Maria and Julia are deeply angry with their father and sorely disillusioned with the man who represents their first and most significant male role model in their short lives. Nevertheless, the undersigned believe it is in the best interests of the children to attempt to resolve this situation through a combination of intensive individual therapy for [Father] . . . , and therapeutic family visitation sessions between [Father], Julia and Maria. The purpose of the individual therapy would be to help [Father] learn more effective methods of handling anger, develop both an empathic understanding of the girls' perceptions and emotional needs as well as a parenting style more sympathetic to their personalities. Therapeutic family visitation would provide the venue for [Father] to practice the skills learned during his own sessions to rebuild his relationships while in a supportive environment. Towards that end the following plan is recommended:

1) After [Father] completes three individual sessions, then therapeutic visitation with [Father], Julia and Maria would occur every other Saturday for one hour each session. Visitation would not occur during the period of time the family plans on taking any vacations. The sessions would occur at The Exchange Club with Ms. Maynard as the therapist.

2) Visitation with Isabella would remain supervised and occur for the hour after [Father]'s visitation with the older girls.

3) [Father] contacts the children by telephone twice during the week: once on Tuesdays and once on Thursdays at 7:00 p.m. He will place the call to their home and if the children wish to talk with him they can answer the telephone. Otherwise, [Father] should leave a short message for the girls. They should be encouraged to speak with him, however, if they do not want to talk, then they are not to be forced.

4) [Father] maintains his private, family social networking page where he posts family pictures and messages for the girls. He is encouraged to continue updating his postings as an unobtrusive method for communicating with his daughters. By regularly updating his postings, he demonstrates the girls' importance to him as well as his desire to maintain the relationships, while respecting their need for distance. They can approach him through the website safely from a distance. It is recommended he avoid lobbying them for attention or affection or applying guilt provoking measures. Rather, he can use this forum to discuss his life, post pictures, ask the occasional question or invite a response.

5) Regular monthly communication occurs between [Father]'s therapist, Ms. Maynard and Drs. Bailey and Beebe to coordinate treatment, discuss progress, and determine the time frame for extending visitation parameters.

Father timely filed a notice of appeal to this Court.[2]

## II. Issues Presented

Father presents the following issues, as restated, for our review:

(1)     Whether the trial court erred by adopting Mother's Permanent Parenting Plan,

---

[2]Following the trial court's entry of the Final Decree and Permanent Parenting Plan Order, the parties filed, and the trial court considered, several post trial motions in this matter. By order entered on December 20, 2011, this Court remanded this matter back to the trial court for the limited purpose of considering any outstanding issues. Thereafter, the trial court clerk transmitted a supplemental record containing the trial court's order of March 20, 2012, disposing of all remaining issues. Thus, this matter is properly on appeal before this Court in light of Father's notice of appeal filed on January 14, 2011.

(2)     Whether the trial court erred by requiring Father to pay $1,500.00 "additional child support," all of the children's private school expenses, and all of the children's out-of-network medical expenses,

(3)     Whether the trial court erred in finding Father in civil and criminal contempt,

(4)     Whether the trial court erred by finding that the appreciation in Mother's partnership interests were Mother's separate property,

(5)     Whether the trial court erred by not taking into account all of Father's debts and by double-counting Mother's attorney's fees in its division of the marital estate,

(6)     Whether the trial court erred by finding that Father dissipated $276,300.00 from the marital estate,

(7)     Whether the trial court erred by awarding Mother alimony *in futuro* and alimony *in solido*.

In addition, Mother presents the following issue for our review:

(1)     Whether Mother is entitled to an award of attorney's fees incurred on appeal.

## III. Standard of Review

We review the trial court's findings of fact with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Accordingly, we will not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence. We review the trial court's conclusions on matters of law *de novo*, however, with no presumption of correctness. Tenn. R. App. P. 13(d). Our review of a trial court's application of the law to the facts is *de novo*, with no presumption of correctness. *State v. Ingram*, 331 S.W.3d 746, 755 (Tenn. 2011).

## IV. Discussion

### A. Parenting Time

We begin by addressing whether the trial court erred in adopting Mother's Permanent

Parenting Plan. Father argues that the trial court erred by failing to award him any parenting time and by conditioning any future parenting time on the therapeutic recommendations of Dr. Bailey and Dr. Beebe. In response, Mother argues that the trial court's Permanent Parenting Plan Order is properly designed to undo the damage that Father, and only Father, caused to his relationship with the children.

Trial courts have wide discretion to establish a parenting arrangement that is in the best interests of the child. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted). The trial court's judgment often turns on subtle factors which require the court to assess the credibility and demeanor of the witnesses. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). We will not substitute our judgment for that of the trial court on these matters. *Eldridge*, 42 S.W.3d at 88. Rather, we will disturb a trial court's decision regarding parental responsibility only if it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Id.*

As this Court explained in *Burden v. Burden*, 250 S.W.3d 899 (Tenn. Ct. App. 2007), it is well established that:

> "By statute as well as case law, the welfare and best interests of the child are the paramount concern in custody, visitation, and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs." *Cummings v. Cummings*, No. M2003–00086–COA–R3–CV, 2004 WL 2346000, at *5 (Tenn. Ct. App. M.S., filed October 15, 2004). "The determination of custody should always be made upon the basis of the best interest of the child, and in accordance with the factors set out in Tenn. Code Ann. § 36–6–106 and Tenn. Code Ann. § 36–6–401." *Hopkins v. Hopkins*, No. M2002-02233-COA-R3-CV, 2003 WL 21462971, *4 (Tenn. Ct. App. M.S., filed June 25, 2003) (*perm. app. granted* December 15, 2003, *as to issue unrelated to this case*). Although the court need not recite the statutory language, there must be some indication that the child's best interest is at the heart of the court's reasoning. . . .
>
> The law on this point is clear: "Regardless of the parents' interest in a custody arrangement, the overriding responsibility of the court is to approve or order a parenting plan that promotes the best interest and welfare of the particular child." *Cummings*, 2004 WL 2346000, at *9. "These decisions are not intended to reward or to punish parents, and, in fact, the interests of the parents are secondary to those of the children." *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997) (citation omitted) (emphasis

added).

*Id.* at 908-09.

When considering the best interests of the children, the trial court is guided by the list of non-exclusive factors listed in Tennessee Code Annotated sections 36-6-106(a) and 36-6-404(b). Among these factors, sections 36-6-106(a)(8) and 36-6-404(b)(12) require courts to consider "[e]vidence of physical or emotional abuse to the child, to the other parent or to any other person." Moreover, Tennessee Code Annotated section 36-6-406(a) mandates that "a parent's residential time as provided in the permanent parenting plan . . . shall be limited if it is determined by the court . . . that a parent has engaged in . . . *a pattern of emotional abuse* of the parent, child or of another person living with that child as defined in § 36–3–601." Tenn. Code Ann. § 36-6-406(a)(2) (emphasis added).

After thoroughly reviewing the record, we find no basis upon which to disturb the trial court's judgment. As the trial court concluded in its Final Decree:

> Pursuant to 36-6-406, [Father] has engaged in a pattern of emotional abuse of the children, and has also engaged in conduct that created much of the children's unhappiness and distress and [Father] is unlikely to cease that pattern of conduct. [Father] refuses to accept that he alone is responsible for the estrangement from his daughters, and refuses to accept his daughters' perspective concerning his behavior, to the detriment of his relationship with his daughters.

We agree. Furthermore, we find that the record contains sufficient evidence of Father's pattern of emotional abuse of the children. As well described by the trial court in its detailed findings of fact:

> 5. [Father] has a history of verbally berating and psychologically abusing the parties' oldest daughter, Maria. [Father] vehemently conducted a police-style interrogation of Maria regarding Maria's damaging [of Father's girlfriend]'s clothing. Dr. Amy Beebe, Dr. Jolene Bailey, and Dr. Fred Steinberg opined that this was "psychologically abusive" to the child.

> 6. During one visit while [Father] was still living in Texas, [Father] dragged the parties' middle child across the floor and locked her in a closet and later gave her a written article on parental alienation syndrome.

> 7. [Father] becomes very angry when his agenda is thwarted and he can

become verbally as well as physically aggressive with his daughters.

8. Despite recommendations from therapists and admonitions by the Court, [Father] has not focused on ways to heal his relationships with his children. [Father] instead has continued to focus on his own perceptions, feelings and agenda.

9. The Court appointed, with the parties' consent, Dr. Fred Steinberg to perform forensic psychological evaluations of the parties through its Order entered on June 5, 2009. Dr. Steinberg's evaluation showed [Father] to be an individual who is prone to be hostile, egocentric and manipulatively controlling, one who tends to be rigid and defensively uncooperative. Dr. Steinberg added that individuals of this type do not tend to recognize their own hostility. Dr. Steinberg also testified that [Father] has narcissistic characteristics; [Father] is critical of others, gets into power struggles, tends to blame shortcomings on others, tends to be controlling, manipulative, haughty, arrogant, and unable or unwilling to respond to others thoughts or feelings. Dr. Steinberg's evaluation of [Father] confirmed and supported [Mother]'s testimony and Maria's statements, and further confirmed the Court's previous findings regarding [Father]'s behavior.

In light of the foregoing, we find no abuse of discretion in the trial court's determination. The trial court's well-reasoned order, incorporating the therapeutic recommendations of Dr. Bailey and Dr. Beebe, provides Father with a step-by-step approach by which he can start to repair his damaged relationship with the children and eventually establish an appropriate parenting arrangement that is in the children's best interests. At this point, it is up to Father as to whether or not he will comply with the trial court's order. Accordingly, we affirm the trial court's order regarding Father's parenting time.

### B. Child Support

Next, we shall address Father's argument that the trial court erred by requiring him to pay all of the children's private school expenses, $1,500.00 in "additional child support," and all of the children's out-of-network medical expenses.

As this Court recently discussed in *Reeder v. Reeder*, 375 S.W.3d 268 (Tenn. Ct. App. 2012), *perm. app. denied* (Tenn. June 20, 2012):

> The process and criteria for ascertaining a parent's child support obligation is governed by Child Support Guidelines promulgated by the

Tennessee Department of Human Services, in accordance with Tennessee Code Annotated § 36–5–101(e). The amount of support derived from a proper application of the formula in the Child Support Guidelines becomes the presumptive child support. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). The presumptive amount of support, however, is rebuttable, Tenn. Code Ann. § 36–5–101(e)(1)(A); Tenn. Comp. R. & Regs. 1240–02–04–.01(1)(d)(1); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005), and a trial court may, in its discretion, deviate from the amount of support required by the Child Support Guidelines. *State v. Wilson*, 132 S.W.3d 340, 343 (Tenn. 2004); *Jones v. Jones*, 930 S.W.2d 541, 544 (Tenn. 1996). When a trial court deviates from the Guidelines, the court is required to specifically state in written findings why the application of the Child Support Guidelines would be unjust or inappropriate in the case. Tenn. Code Ann. § 36–5–101(e)(1)(A); Tenn. Comp R. & Regs. 1240–02–04–.07(1)(b). Although the trial courts retain an element of discretion to deviate from the presumptive amounts, such discretionary decisions must take into consideration the applicable law and the relevant facts. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996).

*Id.* at 275.

### 1. Savings Accounts

At the time of trial, Father's net income was $32,646.00 per month. Thus, we are guided by Tennessee Code Annotated section 36-5-101(e)(1)(B) which provides, in part, that:

[I]f the net income of the obligor exceeds ten thousand dollars ($10,000) per month, then the custodial parent must prove, by a preponderance of the evidence, that child support in excess of the amount provided for in the child support guidelines is reasonably necessary to provide for the needs of the minor child or children of the parties. In making the court's determination, the court shall consider all available income of the obligor, as required by this chapter, and shall make a written finding that child support in excess of the amount so calculated is or is not reasonably necessary to provide for the needs of the minor child or children of the parties.

Tenn. Code Ann. § 36-5-101(e)(1)(B). Furthermore, the Child Support Guidelines provide that:

(g) Statutory Limitation on the Child Support Obligation -- Rebuttal and Deviation.

1. When the presumptive child support order [("PCSO")] exceeds the amount found by multiplying a net income of ten thousand dollars ($10,000) by the percentages set out below, pursuant to Tennessee Code Annotated § 36-5-101(e)(1)(B), a [Primary Residential Parent] seeking support in excess of the amount provided by the applicable percentage must prove by a preponderance of the evidence that more than this amount is reasonably necessary to provide for the needs of the child.

The percentages are:

(i) One child = Twenty-one percent (21%), [or two thousand one hundred dollars ($2100)];

(ii) Two children = Thirty-two percent (32%), [or three thousand two hundred dollars ($3200)];

(iii) Three children = Forty-one percent (41%), [or four thousand one hundred dollars ($4100)];

(iv) Four children = Forty-six percent (46%), [or four thousand six hundred dollars ($4600)]; and

(v) Five or more children = Fifty percent (50%), [or five thousand dollars ($5000)]

2. Application of Statutory Threshold to Child Support Determination.

(i) If the PCSO calculated under these rules exceeds the amount specified above for the number of children for whom support is being calculated, then the amount of the PCSO shall be limited to the amount specified above for the number of children for whom support is being calculated, absent the rebuttal provided for in part 1.

(ii) If the PRP proves the need for support in excess of the amount provided for in part 1, the tribunal shall add an appropriate amount to the PCSO of the ARP as a deviation.

(iii) The court may require that sums paid pursuant to this subparagraph be placed in an educational or other trust fund for the benefit of the child.

Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(g).

In this case, the trial court awarded Mother the statutory threshold amount of $4,100.00 per month. In addition to this amount, the trial court ordered as follows:

Three separate savings accounts will be established into which [Father] will deposit $500.00 per month per account. These accounts are for each of the children. They will be used to cover catastrophic medical expenses, any and all expenses related to college, or any other expenses the parties might agree upon. Reasonable cooperation and good faith agreement is expected from both parents. Any sums that remain unused in these accounts upon the child turning 26 years of age shall be the property of [Father].

The trial court, however, failed to make any findings and provided no justification as to why an amount of child support in excess of the statutory threshold amount was reasonably necessary to provide for the needs of the children. *See* Tenn. Code Ann. § 36-5-101(e)(1)(B). As a result, we are unable to evaluate the propriety of the trial court's decision. Therefore, we remand this issue to the trial court to make the requisite findings and to determine whether an amount of child support in excess of the statutory threshold amount was reasonably necessary to provide for the needs of the children.

## 2. *Private School*

A trial court may order an upward deviation from the Guidelines for extraordinary educational expenses which include tuition and other expenses associated with private school attendance. *Halliday v. Halliday*, No. M2011-01892-COA-R3-CV, 2012 WL 7170479, at *11 (Tenn. Ct. App. Dec. 6, 2012) (citing Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)(1). The Guidelines direct trial courts to consider these expenses on a case-by-case basis and further require them to "consider whether the private elementary or secondary schooling is 'appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and the child were living together.'" *Richardson v. Spanos*, 189 S.W.3d 720, 728 (Tenn. Ct. App. 2005) (quoting Tenn. Comp. R. & Regs. 1240–2–4–.07(2)(d)(1)(ii)). Moreover, "[i]f a deviation is allowed for extraordinary educational expenses, a monthly average of these expenses shall be based on evidence of prior or anticipated expenses and entered on the Worksheet in the deviation section." Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)(1)(iii).

In its Permanent Parenting Plan Order, the trial court ordered as follows:

> Father shall pay as additional child support the costs associated with the children's private school education to include tuition, books, meal plans, uniforms, registration fees, Apple Lighthouse fees, technology fees, and all other fees associated with the children's attendance at private school.

Beyond stating that the children always attended private school, the trial court provided no written findings or any justification for ordering Father to pay for the children's extraordinary educational expenses. Moreover, the trial court made no findings as to the amount of these expenses and failed to enter an amount representing the monthly average of these expenses in the deviation section of the child support worksheets. In the absence of evidence or the requisite findings to support an upward deviation for extraordinary educational expenses, we are unable to properly evaluate the trial court's determination. Therefore, we remand this issue to the trial court to make the requisite findings and determine whether private schooling for the children is appropriate, and if so, who shall pay what portion of these extraordinary educational expenses.

### 3. *Uncovered Medical Expenses*

During the proceedings below, Father allowed his health insurance coverage for the children to lapse. Eventually, Father secured health insurance coverage for the children from his current employer in Jackson. Father's new insurance plan, however, fails to cover many of the children's health care providers in Shelby County. Thus, in order to remedy this problem, the trial court's Permanent Parenting Plan Order requires that:

> Uncovered reasonable and necessary medical, dental, mental health and orthodontic expenses, which may include, but is not limited to, deductibles or co-payments, eyeglasses, contact lens, routine annual physicals, and counseling will be paid by Father.

> The children may stay with their present pediatricians and psychologists even if out of network.

Pursuant to Tennessee Code Annotated section 36-5-101(h)(1) a trial court "may direct the acquisition or maintenance of health insurance covering each child of the marriage and may order either party to pay all, or each party to pay a pro rata share of, the health care costs not paid by insurance proceeds." After reviewing the record, we find no error in the trial court's discretionary decision requiring Father to pay for the children's uncovered medical expenses.

-16-

## C. Contempt

Father argues that the trial court erred by finding him in both civil and criminal contempt. The trial court found Father in civil contempt on Mother's sixth petition for removing furniture from storage, and also on Mother's seventh petition for failing to pay support to Mother in the amount of $39,241.99. Further, the trial court found Father in criminal contempt on Mother's eighth petition for repaying loans to his parents. We shall address each in turn.

### *1. Civil Contempt*

When reviewing a judgment of civil contempt, we utilize the following analysis set forth in *Konvalinka v. Chattanooga-Hamilton County Hospital Authority*, 249 S.W.3d 346 (Tenn. 2008):

> Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

*Id.* at 354-55 (footnotes omitted). A trial court's decision to hold a party in civil contempt is entitled to great weight and this Court will not disturb that determination absent an abuse of discretion. *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993).

In her sixth petition for contempt, Mother argued that Father was in civil contempt for removing property from storage in violation of the following order of the trial court:

> The parties have agreed to a temporary possession of certain personal property by each of them, whereby [Mother] would receive temporary possession of the items attached to this Order as Exhibit "A," and [Father] will receive temporary possession of the items set forth in Exhibit "B," attached to this Order. The parties shall make arrangements to put this agreement into effect. No other personal property shall be removed from storage by either party without Court order. This agreement shall hereby become part of this Order.

After conducting a hearing on the petition, the trial court entered the following order:

With respect to the Sixth Petition for Civil Contempt filed by [Mother] on November 23, 2010 regarding the violation of the Court's Order on the hearing of April 3, 2009, said Order having been entered on June 5, 2009, the Court finds that [Father] is in willful civil contempt of that Order. [Father] shall be remanded to the custody of the Shelby County Sheriff until he places the wooden furniture in a similar climate controlled storage facility, with all of the furniture properly wrapped and covered, and stored separately without inappropriately stacking the furniture on top of other items. [Father] further must give [Mother] access to the storage facility. The Court will defer any issue of damages to the furniture until the final hearing on the divorce.

After thoroughly reviewing the record, we are unable to conclude that the trial court abused its discretion. It is undisputed that Father removed property from storage in violation of the trial court's order. Although Father returned the property to the storage unit once he was informed that he would be held in contempt, the furniture was stacked haphazardly on top of other furniture, the wooden furniture was not properly wrapped and placed in a climate controlled storage unit as it had been before, and some of the drawers had been jammed into the furniture upside down. Pursuant to Tennessee Code Annotated section 29-9-105, "[i]f the contempt consists in the performance of a forbidden act, the person may be imprisoned until the act is rectified by placing matters and person in status quo, or by the payment of damages." Guided by this statute, the trial court acted within its authority by ordering that Father be imprisoned until he rectified the situation by properly storing the furniture as it had been before he removed it in violation of the trial court's order. Accordingly, we affirm the trial court's judgment finding Father in civil contempt as to Mother's sixth petition for contempt.

In her seventh petition for contempt, Mother argued that Father was in civil contempt for failing to pay support arrearages. After conducting a hearing on the petition, the trial court concluded as follows:

With respect to [Mother's] Seventh Petition for Civil Contempt, filed on December 8, 2010 for the non-payment of alimony, school tuition, and attorney fees pursuant to the Divorce Referee's ruling on temporary support, the Court finds that [Father] has admitted he is in arrears in the amount of $39,241.99. . . .

The Court finds that [Father] is in willful civil contempt of the Court Order to pay the above-referenced amount of $39,241.99, and [Father] has the present ability to pay that amount. [Father] shall be remanded to the custody of the Shelby County Sheriff until he purges himself of contempt by paying

that sum in certified funds.

After reviewing the record, we find no error in the trial court's conclusion that Father had the present ability to pay. At the time of the hearing, Father admitted that he had $40,000 in a bank account and was earning a net monthly income of approximately $32,500. We do find, however, that the trial court erred by requiring Father to pay the amount owed in "certified funds." On the day of the hearing, Father presented a personal check to cover the amount of support owed to Mother. The trial court, however, refused to accept this form of payment and ordered that Father be imprisoned until he could purge himself of contempt by paying the amount owed with certified funds. Nothing in the trial court's previous orders required Father to pay support with certified funds only. Therefore, we conclude that the trial court erred by finding Father in civil contempt for failure to pay the arrearage amount with certified funds.[3]

## 2. Criminal Contempt

The willful disobedience of "any lawful writ, process, order, rule, decree, or command" is punishable as criminal contempt. Tenn. Code Ann. § 29-9-102(3). A defendant accused of criminal contempt is presumed to be innocent, and the prosecution bears the burden of proving guilt beyond a reasonable doubt. *Cottingham v. Cottingham*, 193 S.W.3d 531, 538 (Tenn. 2006) (citing *Shiflet v. State*, 217 Tenn. 690, 400 S.W.2d 542, 544 (1966)). Once convicted of criminal contempt, however, the defendant loses the presumption of innocence. *Id.* Thus, on appeal, the issue becomes whether, considering the evidence in the light most favorable to the prosecution, any trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979); *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003); *Black v. Blount*, 938 S.W.2d 394, 399 (Tenn.1996)). Additionally, as with civil contempt, "[w]hen we review a judgment of criminal contempt, we employ the four-element analysis set forth in *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346 (Tenn.2008)." *Furlong v. Furlong*, 370 S.W.3d 329, 336 (Tenn. Ct. App. 2011) (citations omitted).

In her eighth petition for contempt, Mother sought to have Father held in criminal contempt for repaying loans to his parents in violation of the trial court's order, which provided as follows:

The parties have agreed that as of April 3, 2009 [Father] shall be enjoined

---

[3]On January 5, 2011, the day after the hearing, Father purged himself of the two contempt findings by paying the arrearage amount with a certified check and having the property rearranged properly in storage.

from making any transfers of funds to his parents for repayments of loans claimed to be owed to them by [Father]. This agreement shall hereby become part of this Order.

After conducting a hearing, the trial court concluded as follows:

Regarding [Mother's] Eighth Petition for Civil and Criminal Contempt, filed on December 30, 2010, the Court finds that the evidence shows beyond a reasonable doubt that [Father] is in willful contempt of the Court's Orders. Therefore, [Father] shall be remanded to the custody of the Shelby County Sheriff for ten (10) days for each of nine violations of the Court's June 5, 2009 Order, for a total of ninety (90) days of incarceration. [Father] shall be allowed to serve the ninety days in periods of no fewer than two days at a time, either on weekends or on his off days. If [Father] has no weekly off days, the Court will set the schedule.

. . . .

The Court finds that criminal contempt of ninety (90) days shall be served consecutively with [Father]'s sentence for civil contempt, not concurrently.

On appeal, Father argues that the order only prohibited him from repaying funds that he borrowed from his parents before April 3, 2009. On the other hand, Mother argues that the order prohibited Father from repaying his parents for any loans owed to them, regardless of when he borrowed the funds. Therefore, our focus is on the second element of contempt– whether the trial court's order was clear, specific, and unambiguous. As explained in *Konvalinka*:

The second issue involves the clarity of the order alleged to have been violated. A person may not be held in civil [or criminal] contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. *Sanders v. Air Line Pilots Ass'n Int'l*, 473 F.2d 244, 247 (2d Cir.1972); *Hall v. Nelson*, 282 Ga. 441, 651 S.E.2d 72, 75 (2007); *Marquis v. Marquis*, 175 Md.App. 734, 931 A.2d 1164, 1171 (2007); *Cunningham v. Eighth Judicial Dist. Ct. of Nev.*, 102 Nev. 551, 729 P.2d 1328, 1333–34 (1986); *Petrosinelli v. People for the Ethical Treatment of Animals, Inc.*, 273 Va. 700, 643 S.E.2d 151, 154–55 (2007). The order must, therefore, be clear, specific, and unambiguous. *See Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d at 471; *Long v. McAllister–Long*, 221 S.W.3d at 14.

-20-

Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of civil [or criminal] contempt. *City of Gary v. Major*, 822 N.E.2d 165, 170 (Ind.2005); *Judge Rotenberg Educ. Ctr., Inc. v. Comm'r of Dep't of Mental Retardation*, 424 Mass. 430, 677 N.E.2d 127, 137 (1997); *Ex parte Slavin*, 412 S.W.2d at 45. Orders need not be "full of superfluous terms and specifications adequate to counter any flight of fancy a contemner may imagine in order to declare it vague." *Ex parte Blasingame*, 748 S.W.2d 444, 446 (Tex.1988) (quoting *Ex parte McManus*, 589 S.W.2d 790, 793 (Tex.Civ.App.—Dallas 1979)). They must, however, leave no reasonable basis for doubt regarding their meaning. *Int'l Longshoremen's Ass'n, Local No. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967); *Salt Lake City v. Dorman–Ligh*, 912 P.2d 452, 455 (Utah Ct.App.1996).

Orders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed. *United States v. Bernardine*, 237 F.3d 1279, 1282 (11th Cir.2001); *United States v. Young*, 107 F.3d 903, 907–08 (D.C.Cir.1997). Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge. *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir.2006); *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 251 (2d Cir.2002); *Town of Virgil v. Ford*, 184 A.D.2d 901, 585 N.Y.S.2d 559, 560 (1992); *Greene v. Finn*, 153 P.3d at 951. Determining whether an order is sufficiently free from ambiguity to be enforced in a contempt proceeding is a legal inquiry that is subject to de novo review. *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394 (9th Cir.1991); *In re Leah S.*, 284 Conn. 685, 935 A.2d 1021, 1027 (2007); *City of Wisconsin Dells v. Dells Fireworks, Inc.*, 197 Wis.2d 1, 539 N.W.2d 916, 924 (1995).

*Id.* at 355-356 (footnotes omitted).

Pursuant to the analysis provided in *Konvalinka*, we conclude that the trial court's order failed to expressly and precisely spell out which loans Father was forbidden from repaying to his parents. We are required to consider the circumstances surrounding the trial court's issuance of the order using an objective standard, and must construe any ambiguities in the order in favor of Father. *Konvalinka*, 249 S.W.3d at 356. The record indicates that the parties agreed to the entry of this order because Mother did not want Father repaying his parents for loans that he acquired from them while in college and medical school. The

evidence offered at the hearing of Father's alleged contempt, however, related only to payments Father made to his parents for funds borrowed after April 3, 2009. It is undisputed that Father acquired these loans from his parents during the time in which he was unemployed, and used these funds to pay for living expenses, attorney's fees, and the health insurance premiums for Mother and the children. Given the vagueness of the order, and the circumstances surrounding its issuance, it was not unreasonable for Father to assume that these loans were not contemplated within the language that the parties agreed upon in 2009. Such vague and ambiguous orders, however, cannot support a finding of criminal contempt. *See id.* Accordingly, we reverse the judgment of the trial court finding Father in criminal contempt. As a result, "[t]he constitutional provisions against double jeopardy require that the criminal contempt charges be dismissed." *Cottingham v. Cottingham*, 193 S.W.3d 531, 539 (Tenn. 2006) (citing *State v. Hutcherson*, 790 S.W.2d 532, 534–35 (Tenn. 1990)); *see also State v. Wood*, 91 S.W.3d 769, 773 (Tenn. Ct. App. 2002) ("[Criminal contempt] is enough of a crime that the double jeopardy provisions of the state and federal constitutions prohibit a subsequent contempt prosecution after a contempt proceeding starts and comes to an inconclusive end in another court.") (citing *Ahern v. Ahern*, 15 S.W.3d 73 (Tenn. 2000)).

### D. Division of the Marital Estate

Father raises three issues regarding the trial court's division of the marital estate. First, Father argues that the trial court erred by finding that the appreciation in Mother's partnership interests were Mother's separate property. Second, Father argues that the trial court erred by finding that he dissipated $276,300.00 from the marital estate. Third, Father argues that the trial court erred by not taking into account all of his debts and by double-counting Mother's attorney's fees in its division of the marital estate.

As this Court explained in *Rountree v. Rountree*, 369 S.W.3d 122 (Tenn. Ct. App. 2012):

> The division of marital property, including its classification and valuation are findings of fact. *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007). Trial courts have "wide latitude in fashioning an equitable division of marital property." *Altman v. Altman*, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005). Accordingly, the trial court's decisions regarding classification, valuation and division of property are reviewed *de novo* with a presumption of correctness unless the evidence preponderates otherwise. *Farrar v. Farrar*, 553 S.W.2d 741, 743 (Tenn. 1977).

*Id.* at 133.

## 1. Separate Property

The first step in dividing a marital estate is to identify all of the parties' property interests. *Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007) (citation omitted). The next step is to classify the property as either marital or separate. *Id.* (citations omitted). The correct classification of property is essential because the statutory provisions governing divorce provide only for the equitable distribution of marital property. *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988) (citation omitted). All real and personal property acquired prior to a marriage is separate property. Tenn. Code Ann. § 36-4-121(b)(2)(A). Parties are entitled to their separate property without consideration of the equities between them. *Id.* "Because the courts do not have the authority to make an equitable distribution of separate property, whether separate property should be considered marital is a threshold matter." *Keyt*, 244 S.W.3d at 328 (citation omitted).

Pursuant to Tennessee Code Annotated section 36-4-121(b)(1)(B), the income from and the appreciation in value of a spouse's separate property can become marital property where both spouses have substantially contributed to its preservation and appreciation. Tenn. Code Ann. § 36-4-121(b)(1)(B). Those contributions may be direct or indirect. Tenn. Code Ann. § 36-4-121(b)(1)(D). Even so, they must be both "real and significant" and connected in some way to the asset's appreciation in value. *Keyt v. Keyt*, 244 S.W.3d 321, 329 (Tenn. 2007). "[A] spouse seeking to include the other spouse's separate property in the marital estate has the burden of proving that the property fits within the statutory definition of marital property." *Id.* at 328 (citation omitted).

On appeal, Father argues that the trial court erred by finding that the appreciation in Mother's partnership interests were Mother's separate property. In its findings of fact, the trial court discussed Mother's partnership interests at length:

> [Mother] has separate property that includes interests in family partnerships. [Mother]'s father created the partnerships for purposes of estate planning over which [Mother] has no control. [Mother] has phantom income from these partnerships such that undistributed earnings from her interest in these partnerships appear on her income tax returns. The only income from these partnerships that is actually distributed to [Mother] is in an amount to cover the taxes on the income that appears on [Mother]'s tax returns. The business entities retained earnings in an amount that is reasonably required for working capital and for replacement of properties. Neither [Mother] nor [Father] have ever had input or control over the disbursements from the partnerships. There are partnership agreements in place such that [Mother's father] is in sole control of the partnerships and such that he is prohibited from making

-23-

discretionary distributions to partners. It has been the standard practice of the partnerships since inception to make distributions to [Mother] in amounts limited to cover [Mother]'s tax burden caused by her interest in the partnerships.

After thoroughly reviewing the record, we cannot conclude that the evidence preponderates against the trial court's finding that the appreciation in Mother's partnership interests were her separate property. It is undisputed that Mother's interests in the partnerships themselves are separate property. Beyond her ownership interest in the partnerships, Mother had no significant involvement in the partnerships whatsoever. Mother's only involvement with the partnerships was her annual receipt of enough income from the partnerships to cover her tax liability associated with the income attributed to her from the partnerships. Further, we are unable to find any evidence that would preponderate against the trial court's findings that Father in no way contributed to the appreciation in Mother's partnership interests. Therefore, we affirm the trial court's finding that the appreciation in Mother's partnership interests were her separate property.

### 2. Dissipation

Father argues that the trial court erred by finding that he dissipated $276,300 from the marital estate. Specifically, Father challenges the trial court's categorization of the following four expenditures as dissipation: (1) $81,000 in attorney's fees paid to Father's former attorney; (2) Father's depletion of the parties' savings account valued at $45,000; (3) $50,300 in loans Father repaid to his parents in violation of the trial court's order; and (4) $100,000 in unreasonable attorney's fees for unsubstantiated positions and changes of counsel.

When equitably dividing the marital estate, the trial court should consider whether one party dissipated marital assets. *See* Tenn. Code Ann. § 36-4-121(c)(5). The "dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed." Tenn. Code Ann. § 36-4-121(c)(5)(B). Moreover, as our Tennessee Supreme Court explained in *Larsen-Ball v. Ball*, 301 S.W.3d 228 (Tenn. 2010):

Whether dissipation has occurred depends on the facts of the particular case. 24 Am. Jur. 2d Divorce and Separation § 526 (2009). The party alleging dissipation carries the initial burden of production and the burden of persuasion at trial. *Burden v. Burden*, 250 S.W.3d 899, 919 (Tenn. Ct. App. 2007), *perm. to app. denied*, (Tenn. Feb. 25, 2008). Dissipation of marital property occurs when one spouse wastes marital property and thereby reduces

the marital property available for equitable distribution. *See Altman v. Altman*, 181 S.W.3d 676, 681–82 (Tenn. Ct. App. 2005), *perm. to app. denied*, (Tenn. Oct. 31, 2005). Dissipation "typically refers to the use of funds after a marriage is irretrievably broken," *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006), is made for a purpose unrelated to the marriage, and is often intended to "hide, deplete, or divert" marital property. *Altman*, 181 S.W.3d at 681–82. In determining whether dissipation has occurred, trial courts must distinguish between dissipation and discretionary spending. *Burden*, 250 S.W.3d at 919–20; 24 Am. Jur. 2d Divorce and Separation § 526 (2009). Discretionary spending might be ill-advised, but unlike dissipation, discretionary spending is typical of the parties' expenditures throughout the course of the marriage. *Burden*, 250 S.W.3d at 919–20.

*Id.* at 235.[4]

### a. Attorney's Fees

In its final decree, the trial court made the following findings regarding Father's payment of $81,000 to his former attorney:

[Father] hired Attorney Demothenes Lorandos after the filing of the divorce complaint in this matter. [Father] paid to Mr. Lorandos $81,000 from marital funds. The Attorney-Client Retainer Agreement between [Father] and Mr. Lorandos identified Mr. Lorandos' work to include the development of a claim for remedies for parental alienation syndrome, as Mr. Lorandos allegedly has an expertise in parental alienation syndrome. [Father]'s payment to Mr. Lorandos is not the type of discretionary expenditure that is properly made from the marital estate.

[Father] never reviewed the billing statements from Mr. Lorandos.

---

[4]Courts often consider the following factors when determining whether a certain expenditure or transaction amounts to dissipation:

(1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert a marital asset.

*Altman v. Altman*, 181 S.W.3d 676, 682-83 (Tenn. Ct. App. 2005) (citations omitted).

[Father] has no knowledge of what work Mr. Lorandos performed concerning the $81,000 that [Father] paid to him from the marital estate.

We find that the record supports the trial court's conclusion that Father dissipated the marital estate by paying $81,000 to his former attorney. Father was unable to refute Mother's position that these funds were used to develop a civil suit against her for parental alienation syndrome. Such an atypical and wasteful expenditure of marital funds, made with the intent of filing a civil suit against a spouse, in no way benefitted the marriage and clearly amounted to dissipation.

### b. Savings Account

Based on the record before this Court, we are unable to find any evidence presented by Mother that would support her claim that Father dissipated the marital estate based on the depletion of the parties' savings account. Mother's brief states that she "made her allegation of dissipation concerning this account and [Father] offered no proof of how it was spent. Their savings were simply gone. The concept of dissipation is waste and [Father] failed to prove to the Court that he did not waste the funds that were in the savings account." The burden, however, was not on Father to prove to the trial court that he did not waste the funds. Instead, "[t]he party alleging dissipation carries the initial burden of production and the burden of persuasion at trial." *Larsen-Ball*, 301 S.W.3d at 235. Beyond her mere allegations, the only portion of the record cited by Mother to support her position is Father's own testimony that "a good chunk of that money has gone to paying for, you know, this divorce in one form or fashion or another." Because Mother failed to present any evidence to show that Father dissipated the funds in the parties' savings account, we conclude the trial court erred by characterizing Father's use of the funds as dissipation.

### c. Repayment of Loans to Parents

Father's repayment of $50,300 in loans to his parents served as the basis of the trial court's finding of criminal contempt. As discussed above, it is undisputed that Father acquired these loans from his parents during the time in which he was unemployed, and used these funds to pay for living expenses, attorney's fees, and the health insurance premiums for Mother and the children. Absent the trial court's statements that these payments amounted to dissipation because they were in violation of its orders, the record contains no findings or evidence that would support the trial court's conclusion. In light of our reversal of the trial court's criminal contempt finding, we conclude that the trial court erred by classifying Father's repayment of $50,300 in loans to his parents as dissipation.

### d. Unreasonable Attorney's Fees

The fourth category of expenditures classified as dissipation was $100,000 that the trial court referred to as an "[u]nreasonable amount of attorney's fees paid by [Father] for unsubstantiated positions and changes of counsel." Mother argues that the trial court properly classified this expenditure as dissipation because Father frequently changed attorneys, had representation from at least four different law firms, often took positions throughout the litigation that lacked factual or legal support, and made several untruthful statements under oath all of which unnecessarily prolonged the litigation. Upon examination of the record, we agree with Mother and the trial court that Father's actions caused him to incur an unnecessary and excessive amount of attorney's fees that he paid with marital funds. We cannot, however, determine how Mother and the trial court arrived at the amount of $100,000, and there are no citations to the record that would allow us to evaluate the propriety of this amount. Thus, on remand the trial court shall further evaluate Father's expenditure of attorney's fees to determine the appropriate amount of dissipation.

### 3. Debts

Father next argues that the trial court erred by failing to consider his debts in its division of the parties' marital estate.[5] Specifically, Father's table submitted in accordance with Rule 7 of the Rules of the Court of Appeals of Tennessee lists the following debts that he claims the trial court failed to consider:

(1) [Father]'s Chase credit card account: $41.00;

(2) [Father]'s Chase credit card account: $24,716.00;

(3) [Father]'s Regions Bank loan: $27,794.00;

(4) [Father]'s Regions Bank line of credit: $50,000.00;

(5) [Father]'s BancorpSouth Loan: $67,649.00;

(6) Judgment/garnishment against [Father] by Attorney Miles Mason: $11,421.00;

---

[5]In his brief, Father also argues that the trial court erred by listing Mother's attorney's fees as a marital debt because Father was ordered to pay for Mother's attorney's fees. At oral argument, however, Father conceded that after examining the trial court's division of the marital estate, there was no error as to this issue. Therefore, this issue is without merit.

(7) [Father]'s unpaid balance to Attorney Lorandos: $51,209.00;

(8) [Father]'s personal loan from his father: $40,000.00;

(9) [Father]'s unpaid balance to Attorney Covert: $30,002.00;

(10) Rent/utilities owed to [Father]'s girlfriend: $10,600.00; and

(11) [Father]'s debt to Computer Credit, Inc.: $1,088.00.

After thorough review, we are unable to find anywhere in this voluminous record that indicates that the trial court considered the debts listed by Father. Moreover, neither party has provided any citation to the record that would indicate that the trial court did in fact take these debts into consideration when making its distribution of the marital estate. While we agree with Mother that in some cases this Court is able to infer that a trial court made implicit findings regarding a particular asset or debt– this is not one of those cases. From the record before us, we are unable to determine when and for what purpose Father incurred the debts listed above. The only thing we are able to determine is that Father undoubtedly presented these debts to the trial court. Therefore, we must remand this matter to the trial court to reconsider its distribution of the parties' marital estate in accordance with Tennessee Code Annotated section 36-4-121.[6]

### E. Alimony

The trial court awarded alimony *in futuro* and alimony *in solido* to Mother. In its alimony *in futuro* award, the trial court ordered Father to pay Mother $8,500 per month until the parties' youngest child graduates from high school. The trial court further ordered Father to pay Mother's attorney's fees as alimony *in solido* in the amount of $413,625.79. Based on our review of the record, we find no error in the trial court's decision to award Mother both alimony *in futuro* and alimony *in solido*. In light of our remand to the trial court to reconsider its distribution of the parties' marital estate, however, the trial court must reconsider its awards of alimony as well. *See* Tenn. Code Ann. § 36-5-121(i)(7)-(8) (providing that the trial court must consider the separate assets of each party in addition to the distribution of the parties' marital property when awarding alimony). Accordingly, we remand this case to the trial court for the reconsideration of its alimony awards.

---

[6]When reconsidering its distribution of the marital estate on remand, the trial court is reminded that "[a]ttorney fees incurred by each party are not marital debt." *Rountree v. Rountree*, 369 S.W.3d 122, 134 (Tenn. Ct. App. 2012) (citation omitted).

## F. Appellate Attorney's Fees

Finally, Mother requests an award of her attorney's fees incurred on appeal. "An award of appellate attorney's fees is a matter within this Court's sound discretion." *Chaffin v. Ellis*, 211 S.W.3d 264, 294 (Tenn. Ct. App. 2006) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). When considering a request for attorney's fees incurred on appeal, we consider the requesting party's ability to pay such fees, the party's success on appeal, whether the party sought the appeal in good faith, and any other equitable factors relevant in a given case. *Id.* (citing *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at * 16 (Tenn. Ct. App. July 19, 2005)). In this matter, we decided issues in favor of and adversely to both Mother and Father. Therefore, exercising our discretion, we find it equitable to deny Mother's request for attorney's fees incurred on appeal.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's judgment regarding Father's parenting time; the trial court's judgment ordering Father to pay uncovered medical expenses; the trial court's judgment holding Father in civil contempt on Mother's sixth contempt petition; the trial court's classification of the appreciation in Mother's partnership interests as Mother's separate property; and the trial court's finding that Father dissipated the marital estate in the amount of $81,000.

We reverse the trial court's judgment holding Father in civil contempt on Mother's seventh contempt petition; the trial court's judgment holding Father in criminal contempt on Mother's eighth contempt petition; the trial court's conclusion that Father dissipated the marital estate in the amount of $45,000 by depleting the parties' savings account; and the trial court's conclusion that Father dissipated the marital estate in the amount of $50,300 by repaying loans to his parents. In light of our reversal of the trial court's conclusions regarding Father's contempt and dissipation of the marital estate, the trial court is directed on remand to reconsider the amount of attorney's fees that Father was ordered to pay in relation to these issues.

We vacate the portion of the trial court's order requiring Father to establish and pay excess child support into savings accounts for the children and remand this issue to the trial court to make the requisite findings and to determine whether an amount of child support in excess of the statutory threshold amount was reasonably necessary to provide for the needs of the children; we vacate the portion of the trial court's order requiring Father to pay for the children's private school expenses and remand this issue to the trial court to make the requisite findings and determine whether private schooling for the children is appropriate,

-29-

and if so, who shall pay what portion of these extraordinary educational expenses; we vacate the trial court's conclusion that Father dissipated the marital estate by spending $100,000 on unreasonable attorney's fees and remand this issue to the trial court to further evaluate Father's expenditure of attorney's fees to determine the appropriate amount of dissipation; and we vacate the trial court's distribution of the marital estate and remand this issue to the trial court to consider Father's debts and make an equitable distribution of the parties' marital estate in accordance with Tennessee Code Annotated section 36-4-121.

Although we find no error in the trial court's awards of alimony *in futuro* and alimony *in solido*, in light of our remand to the trial court to reconsider its distribution of the parties' marital estate, the trial court must reconsider its awards of alimony as well. *See* Tenn. Code Ann. § 36-5-121(i)(7)-(8) (providing that the trial court must consider the separate assets of each party in addition to the distribution of the parties' marital property when awarding alimony). Costs of this appeal are taxed equally to the Appellant, Erik A. Beyer, and his surety, and the Appellee, Desiree M. Beyer, for all of which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE