# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 17, 2016 Session

## JENNIFER REBECCA CRESWELL HENEGAR v. JASON ADAM HENEGAR

**Direct Appeal from the General Sessions Court for Wilson County**
**No. 2014-DC-86     John Thomas Gwin, Judge**

---

**No. M2015-01780-COA-R3-CV – Filed June 29, 2016**

---

This appeal is from a final decree of divorce.  The wife challenges several of the trial court's rulings regarding the grounds for the divorce, the division of marital property, the parenting plan, the calculation of child support and educational expenses, and attorney's fees.  For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed in part, Reversed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and RICHARD H. DINKINS, J., joined.

Sean James Martin and Jennifer Lynne Sheppard, Nashville, Tennessee, for the appellant, Jennifer Rebecca Creswell Henegar.

Charlene Robin Vance, Watertown, Tennessee, for the appellee, Jason Adam Henegar.

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

Jennifer Rebecca Creswell Henegar ("Wife") and Jason Adam Henegar ("Husband") were married in September 2007.  They had a son ("Son") in June 2010. Wife and Husband "separated" in November 2013, but both continued to reside with Son in the marital home in Mount Juliet, Tennessee.  After six years of marriage, Wife filed a complaint for divorce in May 2014.  As grounds for divorce, she alleged irreconcilable differences and inappropriate marital conduct by Husband.  Specifically, Wife alleged that Husband refused or neglected to provide for her financially despite having the ability

to do so. Wife sought to be named primary residential parent of Son and requested child support. She also sought an award of attorney's fees.

Husband filed an answer and counter-petition. He admitted the existence of irreconcilable differences but denied that he had engaged in inappropriate marital conduct or refused to provide for Wife. Husband alleged that Wife was guilty of inappropriate marital conduct by abusing prescription medications. Husband asserted that he should be named primary residential parent and that Wife should be required to pay child support.

One year after the divorce complaint was filed, in June 2015, Wife was permitted to amend her complaint to allege, as an additional ground for divorce, that Husband committed adultery. Less than two weeks after the allegation, Husband filed an answer admitting that he engaged in extramarital relations with someone approximately one year after the divorce was filed.

The divorce trial was held on July 20, 2015. At that time, Husband was 38 years old, Wife was 36 years old, and Son was five years old. They all continued to reside in the marital home.

Husband worked as a wildlife biologist for the Tennessee Wildlife Resources Agency ("TWRA"), where he began working in 2008 shortly after the parties married. Husband's annual salary from the TWRA was $60,384. Husband also worked a second full-time job at Bass Pro Shop, where he worked 36 to 38 hours a week and earned $10.61 an hour, for an average of $19,861.92 per year.

At the time of trial, Mother had been a stay-at-home mother for about four years. Prior to the marriage, Wife completed three semesters of college and worked for three years in Texas as an office manager and executive administrative assistant for a radiology group, earning nine to ten dollars an hour. When she and Husband married and moved to Tennessee, Wife secured employment in Nashville at Hospital Corporation of America and earned around $18 an hour. Wife worked in that capacity for approximately three and a half years, until March 2011, when Son was about nine months old. At that point, Wife took a job at a television network for less money in order to be closer to home. She earned ten to eleven dollars an hour at the television network but was terminated during her probationary period after two months. Husband and Wife agreed that she would stay at home with Son in order to avoid the cost of daycare. Shortly thereafter, Husband began working at Bass Pro Shop in August 2011. When Son turned three, he began attending preschool part-time at a private Christian academy. He had been attending for two years at the time of trial, two days per week the first year and three days per week the second year, from 8 a.m. to noon. However, Wife did not return to the workforce. Wife testified that she intended to move out of the marital home as soon as possible after the

divorce. She testified that she had posted her resume on two websites and was "receiving phone calls on my resume as we speak." Wife said that her parents would continue to provide her with financial support until she found a full-time job and assist her with any deficit thereafter.

Husband and Wife struggled with debts prior to and during their marriage. Wife testified that she had "a significant amount of bad debt" prior to the marriage, and she and Husband worked together to pay off her past due debts. Wife still had a $5,000 student loan debt when the parties married, and Husband paid off that debt during the marriage. However, Husband also had significant credit card debt and got behind on the payments when the parties moved to Tennessee after the marriage. Several lawsuits were filed against Husband in order to collect debts that were due to credit cards and medical expenses, and several liens were filed against the marital home. At the time of trial, the mortgage debt and liens on the marital home greatly exceeded its value.

Husband admitted to committing adultery and inappropriate marital conduct but testified that he was no longer in a relationship with his paramour. Husband asserted that Wife had engaged in inappropriate marital conduct by failing to be a supportive spouse due to her prescription drug use and her failure to support his work efforts. At one point during the marriage, Wife was taking at least ten different prescription medications, including Xanax, oxycodone, and Ambien. Wife had various injuries, medical conditions, and surgeries prior to and during the marriage. She suffered from an anxiety disorder and had been taking an antidepressant for anxiety and depression since the age of 18. However, Husband testified that Wife recently had "done better to get her prescription drugs under control," and by the time of trial, she had made great strides with her physical and mental health. Wife testified that she had always taken her medication as prescribed and that Husband had never expressed concern about her prescription drug use before the divorce proceeding.

Wife was questioned about two incidents involving her consumption of alcohol, including one recent evening when she consumed three to four beers after Son went to sleep, even though Wife testified that Son crawls in bed with her "every single night." Wife said, "I do not drink alcohol. That was a one-time fluke, stressed night[.]" However, she later acknowledged that she also consumed alcohol when she was delayed at an airport and alone with Son.

Husband testified that the parties experienced "a lot of anger, a lot of issues, a lot of conflicts in the last four years, and even before that, due to finances." He testified that on several occasions when Wife complained about not having enough money, he expressed to her that if she wanted more money then she would have to go back to work because he could not do any more than he was already doing. Wife complained at trial

that Husband failed to provide for her financially, forcing her to rely on financial contributions from her family. Wife conceded that Husband paid the mortgage payment, the family's bills, her medical co-pays, and Son's preschool tuition costs, but she claimed that he failed to give her sufficient money for groceries, gas, and other expenses. Wife's checking account statements reflected expenditures for getting her nails done twice a month and spending $120 to $250 on her hair; however, Wife claimed that she was only able to afford these expenses because she was receiving financial contributions from her parents. Despite Wife's complaints about the parties' finances, she estimated that she asked Husband "probably every week" to quit his second job so that he could spend more time at home. Wife wanted Husband to get one job that paid more money. She claimed that Husband "failed to be present in th[e] marriage" due to his work schedule, which lasted, she said, from 6 a.m. or earlier to either 6 p.m. or 10 p.m.

Husband acknowledged that his work schedule significantly interfered with his ability to spend time with Son. He worked seven days a week. On some days, he worked a twelve-hour shift at one job, beginning at 5:30 a.m., and was able to spend the evening with Son and Wife. On other days, however, Husband worked at both jobs and was gone from early in the morning until 10 p.m. Husband testified that he made the decision to take a second full-time job after Wife stopped working and several judgments were entered against him. He acknowledged that Wife often asked him to quit his second job in order to spend more time at home with her and Son, but Husband said he did not quit because he was the only parent working, and the funds were necessary to provide for the family and pay the debts. Husband testified that by working two jobs, he had made a significant "dent" in his debt and paid off several judgments, but he recognized that he would not be out of debt anytime soon.

Although Son turned five in June, just prior to the trial in July, he was not enrolled to begin kindergarten in August due to his late birthday and some developmental delays. Instead, Son was scheduled to begin a full-time pre-kindergarten program five full days per week beginning in August. Son was projected to begin kindergarten the following year, soon after he would turn six years old. Husband and Wife made these educational decisions together. The cost of Son's pre-K tuition would be $508 per month, with an additional $180 per month for extended care before and after school. Husband testified that extended care would be necessary because Wife intended to begin working outside the home.

Son was diagnosed with a sensory processing disorder at the age of three, which caused him to become anxious in unfamiliar environments. Wife said she suspected that something was wrong because Son "was a little bit delayed as far as his interaction with other kids" while playing soccer and attending preschool, and he became anxious at restaurants and stores, causing him to hum, grit his teeth, make noises to comfort himself,

4

and squeeze her arms. After Son was formally diagnosed, he began occupational therapy once a week to retrain the way he adapted to situations in his environment. Wife testified that Son was physically healthy and that his sensory processing disorder was "under control" at the time of trial.

Husband admitted that Wife is a good mother and provides a safe and stable environment for Son. Wife similarly admitted that Husband is "a very good father" when he is present. She testified that he gives Son baths, brushes his teeth, dresses him, and helps with dinners, when he is not working. Wife admitted that Husband missed very few of Son's baseball and soccer practices and games and was "in the field" with Son and the other children. She said Husband "makes himself available" when needed. Husband testified that he does everything he can to attend activities and events with Son and has a lot of flexibility to use "comp" time from the TWRA in order to attend Son's baseball practices and games, swimming lessons, and similar activities. He acknowledged that Wife had been the primary caregiver due to his work schedule. However, he also testified that when he is at home, he is very active and "an equal parent."

Wife sought to be named primary residential parent of Son. She emphasized repeatedly that she wanted Husband to be part of Son's life and "to be available as much as he possibly can," but she said she did not know how that would be possible with Husband's work schedule. Husband testified that he would quit his job at Bass Pro Shop if he were named primary residential parent, and he said that he frequently had the ability to work from home for the TWRA. He testified that he had already discussed changing his work schedule with his supervisors. Despite his proposed parenting plan seeking to be named primary residential parent, Husband testified that he believed a week-to-week schedule would be preferable. For example, he explained that under Wife's proposed parenting plan, designating 80 days of parenting time annually for Husband, the parties would be required to have 101 child exchanges per year, resulting in 101 transition periods for Son. Her plan also included one period of three weeks when Husband would not see Son due to fall break.

Husband also testified about some concerns he had with Wife's behavior during his parenting time with Son during the divorce proceeding. Husband took Son to East Tennessee to the Tri-Cities area to visit his family for Christmas break. He provided an itinerary for Wife prior to the trip, and Wife then traveled to "the same area" of East Tennessee at the same time. When asked why she did that, Wife said,

> I have an anxiety disorder. I also -- my son had never been away from me. With his sensory processing disorder, he had never been that far away from me for that length of time. That was the very first time he had ever traveled [alone] with his father. I wanted to make sure that if my son had a sensory

processing episode or situation where they couldn't get him comfortable or help him feel relaxed, that I could help maybe calm him down if necessary, and give him and help him be comfortable.

Even with Wife in close geographical proximity, she still insisted on "Facetiming" with Son at least twice a day during the trip. Husband testified that Wife's consistent telephone calls interrupted his quality time during the visit.

Aside from Husband and Wife, the only other witness to testify was one of Husband's coworkers at the TWRA. He had a three-year-old son, and Husband had suggested that Wife babysit for him in 2013. Wife did in fact babysit for the witness for almost one year, and the witness was satisfied with Wife's care for the child. The witness also believed that Husband was a good father and that he was involved with Son and his sports activities.

At the conclusion of the testimony, the trial court took the matter under advisement. The next day, the trial court issued a memorandum containing its findings of fact and conclusions of law, which were ultimately memorialized in a final decree of divorce on August 12, 2015. The trial court found that both parties had grounds for divorce and declared the parties divorced pursuant to Tennessee Code Annotated section 36-4-129. The trial court divided the parties' marital assets and debts, awarding the marital residence and its related debt to Husband. The trial court concluded that Son's best interest would best be served by a parenting schedule of 182.5 days per year for each parent, on a week-to-week schedule, with exchanges on Friday afternoons. The trial court ordered Husband to pay Wife child support. It calculated child support by using Husband's income from the TWRA and Bass Pro Shop and imputing income to Wife based on earnings of ten dollars an hour. The court ordered the parties to equally share the cost of Son's preschool tuition and extended care expenses. The parenting plan provided that the parenting schedule and child support obligation would begin when Wife vacated the marital residence. The court ordered the parties to be responsible for their own attorney's fees. Wife timely filed a notice of appeal.

## II. ISSUES PRESENTED

We have combined and restated Wife's issues as follows:

1.      Whether the evidence preponderates against the trial court's factual findings;

2.      Whether the trial court erred by failing to award Wife a divorce based on the grounds of inappropriate marital conduct and adultery;

3.     Whether the trial court erred with respect to its division of marital property by requiring Wife to remain a co-borrower on the mortgage secured by the marital residence awarded to Husband;

4.     Whether the trial court erred in determining that an equal residential schedule was in the best interest of the child and in failing to designate a primary residential parent;

5.     Whether the trial court erred in imputing income to Wife for the purpose of calculating child support;

6.     Whether the trial court erred in including childcare costs that had not been incurred at the time of trial and in requiring the parties to split those costs equally;

7.     Whether Wife was entitled to an award of attorney's fees.

In his posture as appellee, Husband asks this Court to affirm the trial court on all issues. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.


## III. Discussion

### A. The Trial Court's Factual Findings

In her first issue on appeal, Wife contends that "multiple findings of fact made by the trial court are plainly incorrect, or in the alternative are not supported by the weight of the evidence." Wife vaguely asserts that the trial court "abused its discretion by erroneously stating the evidence presented at trial, making findings of fact contrary to the weight of the evidence, and applying incorrect facts to the case as a whole and the trial court should be reversed due to this error." Wife then quotes twenty-two separate multi-sentence paragraphs from the final decree of divorce and claims that each one of the factual findings was, for example, "one-sided," taken out of context, or factually incorrect. However, Wife does not explain how each factual finding she challenges relates to the particular issues she raised on appeal. Some of the factual findings quoted by Wife are clearly irrelevant to the issues before this Court. For example, Wife challenges certain factual findings made specifically by the trial court for purposes of dividing the marital property regarding each party's contribution to the other spouse's education and earning potential. However, the only issue raised on appeal regarding the

7

division of marital property is whether Wife should have been removed as a co-borrower on the mortgage for the marital residence. Wife does not suggest that the trial court's factual finding about the parties' contributions to earning potential impacted its decision about the mortgage in any way. It is not enough to say that the trial court applied "incorrect facts to the case as a whole and the trial court should be reversed due to this error."

When examining each of the substantive issues raised by Wife on appeal, we will review the factual findings she challenges to the extent that they are relevant to those issues. However, without some specific showing of prejudice, we decline the invitation to engage in a rote examination of each factual finding in the lengthy divorce decree simply to determine, for the sake of argument, whether it was correct.

## B. Grounds for Divorce

Wife argues on appeal that the trial court erred in declaring the parties divorced rather than awarding a divorce to her based on the grounds of Husband's inappropriate marital conduct and adultery. As stated above, both spouses alleged that the other engaged in inappropriate marital conduct. Wife alleged that Husband failed to financially provide for her or spend time at home, while Husband alleged that Wife abused prescription drugs and failed to be supportive of his work efforts. Husband admitted that he committed adultery during the divorce proceeding and engaged in inappropriate marital conduct.

The trial court made the following findings regarding the grounds for divorce:

> Wife's primary grounds for divorce from Husband are counter-intuitive. She sincerely complains that he is not a good provider, and that he fails to "be present" with her and the child. Husband is incapable of doing both. He works eighty hours a week, and cannot be in two places at one time. Following the parties' separation, Husband entered into an adulterous relationship.
> As to grounds for divorce, the Court finds that each party has grounds for divorce. Accordingly, the bonds of matrimony heretofore existing between the parties are forever and perpetually dissolved pursuant to Tennessee Code Annotated §36-4-129. Both parties are restored to all of the rights and privileges of unmarried persons.

On appeal, Wife argues that declaring parties divorced pursuant to Tennessee Code Annotated section 36-4-129 "is generally reserved for cases where the proof reflects both parties are entitled to a divorce upon some valid ground." She claims that the evidence at

trial did not demonstrate any misconduct on her part that rose to the level of grounds for divorce and therefore the trial court should have awarded the divorce to her.

We begin with the language of the statute. Tennessee Code Annotated section 36-4-129(b) provides, in relevant part, that "[t]he court may, upon stipulation to or proof of any ground of divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault *or*, if *either or both* parties are entitled to a divorce . . . declare the parties to be divorced, rather than awarding a divorce to either party alone." This language refutes Wife's assertion that the trial court could not declare the parties divorced if only one party had grounds for divorce. Section 36-4-129(b) "'permits a trial court to declare the parties divorced not only when both parties have proved that they have grounds for divorce, but also when only one party has proved grounds for divorce.'" *Hill v. Hill*, No. M2001-01016-COA-R3-CV, 2002 WL 31863295, at *3 (Tenn. Ct. App. Dec. 23, 2002) (quoting *Pate v. Pate*, No. M1998-00947-COA-R3-CV, 2001 WL 985066, at *4 (Tenn. Ct. App. Aug. 27, 2001)). "The statute, by its own terms, empowers courts upon sufficient proof of any ground for divorce to declare the parties divorced regardless of who may be at fault." *Mumford v. Mumford*, No. E2002-01338-COA-R3-CV, 2003 WL 21673675, at *4 (Tenn. Ct. App. July 14, 2003). It "clearly states that if *either* party is entitled to a divorce, the court can declare the parties divorced." *Hill*, 2002 WL 31863295, at *3. The statute "'does not require the trial court to weigh the relative degrees of fault or to grant the divorce to the party who, in the court's mind, is less at fault." *Id.* (quoting *Pate*, 2001 WL 985066, at *4). If the court finds that either party has established grounds for divorce, it has the discretion to declare the parties divorced rather than to grant either party, even a party without fault, the divorce. *Id.* at *4.

In this case, the trial court found that *both* parties were at fault and declared the parties divorced rather than awarding the divorce to either party. "A trial court's decision to declare parties divorced, rather than granting a divorce to one of the parties, is reviewed under an abuse of discretion standard." *Ward v. Ward*, No. M2012-01184-COA-R3-CV, 2013 WL 3198157, at *13 (Tenn. Ct. App. June 20, 2013); *see also Morrissett v. Morrissett*, No. W2003-01052-COA-R3-CV, 2004 WL 1656479, at *6 (Tenn. Ct. App. July 23, 2004) ("We review the trial court's decision as to which party is entitled to the divorce for an abuse of discretion."). Once any ground for divorce has been stipulated or proven, "'the trial court may award a divorce to a party less at fault or declare the parties divorced; such choice is left to the trial court's discretion.'" *Truman v. Truman*, No. E2009-00237-COA-R3-CV, 2010 WL 323066, at *6 (Tenn. Ct. App. Jan. 28, 2010) (quoting *Watson v. Watson*, No. W2004-01014-COA-R3-CV, 2005 WL 1882413, *4 (Tenn. Ct. App. Aug. 9, 2005)). The record before us suggests that both spouses engaged in conduct that caused distress to the other party and contributed to the dissolution of the marriage. Neither party was faultless in the breakdown of the marriage. It does not matter, for purposes of this appeal, whether Wife's conduct technically rose to

9

the level of inappropriate marital conduct as an additional ground for divorce. *See Truman*, 2010 WL 323066, at *5 (declining to review a finding of inappropriate marital conduct where there was another sufficient basis for awarding the divorce, as the findings on the subject were "unnecessary surplusage"). Here, grounds for divorce existed, so the trial court was authorized to declare the parties divorced pursuant to Tennessee Code Annotated section 36-4-129. We discern no error in the trial court's decision to declare the parties divorced instead of awarding a divorce to Wife alone. Declaring the parties divorced was among the acceptable alternatives given the evidence presented at trial.

### C. *Marital Property Division – Liability for the Mortgage*

Wife's next issue involves the mortgage on the marital home. The parties had been residing in the marital home for six years at the time of trial. Wife conceded that the parties had no equity in the home. The parties purchased the marital home in August 2008 for $165,000, with a mortgage of $162,850. The mortgage was refinanced in 2010 for a total of $167,939. Both parties were listed as co-borrowers on the mortgage. The tax appraisal value of the home was $147,100. Several judgment liens were filed against the marital home due to credit card debt and medical debt, and at the time of trial, the judgment liens totaled $43,327.74. The total recorded indebtedness against the property was $211,266.74. The home had a *negative* equity of $64,166.74. The parties were able to stay current on their mortgage payments, but Husband testified that he was "working week-to-week with money" and did not have an excess.

Wife wanted the court to order the house sold and to order Husband to pay the deficit that would remain after the sale based on the liens and mortgage liability. In its final order, the trial court described the amount of debt Husband took away from the marriage as "overwhelming." With regard to the marital home, the court made the following findings:

> At the time the division of property is to become effective, the parties own a marital residence which is hopelessly over-mortgaged and has considerable judgment lien debt. Wife suggests that the property be sold and that Husband pay the remaining debt. Because of the judgment liens, there is no way for the house to be sold and the debt extinguished so as to allow closing and transfer of the deed. Neither party has the present ability to accomplish this.
>
> . . . .
>
> The parties have accumulated $43,327.74 in marital debt under three separate General Sessions Court judgments. Each judgment bears interest at the rate of 5.25% interest. The minimum amount of payments due on these agreed judgments will not even pay the debt service. The amount of the

10

judgments continues to grow. Each judgment has been recorded as liens in the Register's Office for Wilson County, Tennessee, and are thus attached to the marital residence.

. . . .

Wife does not wish to retain the marital residence. The Court accredits her testimony that she cannot afford it. The Court will not require the marital residence to be sold, inasmuch as neither party can afford to complete the transaction. Husband testified that he does not want to take bankruptcy, and the Court cannot force him to do so. All of Wife's right, title and interest in the marital residence shall be divested out of Wife, and vested in Husband. Husband shall indemnify and hold Wife harmless from any debt associated with the marital residence, and all other debt assigned solely to him under this memorandum.

Wife filed a post-trial motion arguing that she should have been formally relieved of the debt associated with the marital home instead of being left with her name on the loan indefinitely. During the hearing on the motion, the trial judge questioned Wife's attorney as to what steps she proposed that Husband be required to take in order to remove Wife's name from the mortgage. She acknowledged that someone would have to come up with $60,000 to satisfy the liens and mortgage balance remaining after the sale of the property. She then proposed that Husband should be forced to refinance the entire amount of the indebtedness. However, the trial judge asked if counsel was aware of any company that would be prepared to make such a loan, and she was not. Counsel for Husband suggested that no mortgage company would loan Husband 150% of the fair market value of the property. The trial court likewise concluded that Husband would be incapable of completing such a transaction. The court entered an order stating that "there is no possible way to relieve Wife from liability on the mortgage indebtedness unless the property is allowed to go to foreclosure. Neither Husband nor Wife has the present ability to pay $60,000.00, which is the approximate amount that would be required to sell the property and satisfy the mortgage/lien indebtedness."

On appeal, Wife criticizes the trial court's ruling as requiring the parties to "remain tethered together indefinitely." She claims that she must now wait until Husband pays off the mortgage, sells the home, or enters bankruptcy in order to gain relief from the debt. Wife claims that her debt-to-income ratio is negatively impacted in such a way that it may become difficult for her to purchase a new residence in the future. Wife argues that the trial court should have required Husband to either sell the house immediately, refinance all of the debt, or "otherwise solely assume the debts associated with the house."

Decisions regarding the division of marital property are fact-specific and require

11

consideration of many circumstances surrounding the property and the parties. *Downing v. Downing*, No. M2010-00045-COA-R3CV, 2011 WL 2418732, at \*5 (Tenn. Ct. App. June 13, 2011). Trial courts have broad discretion in fashioning an equitable division of marital property, and appellate courts accord great weight to the trial court's decision. *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007). Wife does not cite any caselaw on appeal to suggest that the trial court erred in making its decision regarding the mortgage, and she does not suggest any specific options for removing her name from the mortgage that appear to be feasible under the circumstances.

> In divorce proceedings, courts cannot disturb the rights of the parties' creditors to collect joint obligations from either or both of the divorcing parties. *Blake v. Amoco Fed. Credit Union*, 900 S.W.2d 108, 111 (Tex. App. 1995).
>
> It is not uncommon in divorce cases to turn over the ownership of a marital asset to one party while the parties remain jointly liable for the debt associated with the asset. While it is possible to order one party to make the monthly payments on a joint debt, the court cannot absolve the other party from his or her liability to the creditor. It is also unlikely that a creditor will readily agree to release a solvent debtor simply because of a divorce. Thus, if the party who has been ordered to make the monthly payments on a joint debt defaults, the other party becomes responsible for the debt and the late charges and runs the risk of damage to his or her credit rating.
>
> Courts and lawyers have devised several ways to address this problem. The court may order, or the parties may agree, that the person awarded the property will refinance it or obtain a new loan in his or her own name and then use the proceeds to pay off the existing joint debt. The court may also order, or the parties may agree, that the property will be owned jointly until a date certain when the property must either be financed or sold. Finally, the parties or the courts may include a "hold harmless" provision in the decree or marital dissolution agreement in which the parties are required to indemnify and hold each other harmless from any and all future obligations stemming from ownership of the property they receive.

*Long v. McAllister-Long*, 221 S.W.3d 1, 10 (Tenn. Ct. App. 2006). In the absence of any other feasible alternatives, the trial court in this case opted for the third option, ordering Husband to "indemnify and hold Wife harmless from any debt associated with the marital residence." We recognize that neither Wife nor Husband is placed in an advantageous situation. However, as the trial judge aptly stated, "a divorce doesn't mean a fresh start." We cannot say that the trial court erred in its conclusion that Wife must remain a co-borrower on the mortgage due to the parties' financial constraints.

### D. Parenting Issues

The next set of issues raised by Wife deals with the trial court's rulings regarding a parenting schedule for Son. In the final decree, the trial court began by noting the statutory directive to order a custody arrangement that permitted both parents to enjoy the maximum participation possible in the life of the child consistent with the statutory factors set out in Tennessee Code Annotated section 36-6-106 (a)(1)-(15), the location of the parents' residences, the child's need for stability, and all other relevant factors. The trial court then made very detailed findings of fact, spanning 34 paragraphs, in support of its decision to order equal parenting time for the parties. Wife analyzes each of the statutory factors in her brief on appeal and challenges numerous factual findings made by the trial court with respect to these factors. We will address each applicable factor as well. However, we do so with the following standard of review in mind:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. Thus, determining the details of parenting plans is peculiarly within the broad discretion of the trial judge. It is not the function of appellate courts to tweak a residential parenting schedule in the hopes of achieving a more reasonable result than the trial court. A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. An abuse of discretion occurs when the trial court applies an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. A trial court abuses its discretion in establishing a residential parenting schedule only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.

*Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013) (citations and quotations omitted).

Tennessee Code Annotated section 36-6-106(a) provides factors for the court to consider when making a custody determination in a divorce case in order to determine an arrangement that serves the best interest of the child.[1] The trial court must "order a

---

[1]Wife argues on appeal that the trial judge made comments at the conclusion of the testimony that

custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child" consistent with the statutory factors, the location of the residences of the parents, the child's need for stability, and all other relevant factors. Tenn. Code Ann. § 36-6-106(a). The first factor is the "strength, nature, and stability of the child's relationship with each parent" and whether one parent has performed the majority of parenting responsibilities relating to the daily needs of the child. Tenn. Code Ann. § 36-6-106(a)(1). With regard to this factor, the trial court found that Son has a strong relationship with both parents. The court found that Wife had been present during more waking hours than Husband, but when Husband was not working, he took the child fishing and participated in his sports activities. Wife contends that this finding was "quite one-sided," but at the same time, she "does not deny the truth of the finding." We agree that the evidence supports this finding and do not consider it one-sided.

The next factor requires consideration of each parent's "past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents [] to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child." Tenn. Code Ann. § 36-6-106(a)(2). The court should consider the likelihood of each parent to honor and facilitate court ordered parenting arrangements and rights. *Id.* Regarding this factor, the trial court noted that both Wife and Husband testified that it would be in Son's best interest for Husband to have more participation in Son's life. The court noted that Wife reiterated this point at least three times during the trial. Accordingly, the court credited this testimony.

The court also noted, however, that Wife was "excessively protective" of Son when Husband exercised parenting time, as demonstrated by Wife's decision to follow Husband to East Tennessee. The trial court found that Wife "suffers from anxiety disorder when separated from the child." The trial court found no act, event, or omission on Husband's part that would be a reasonable basis for Wife's anxiety issues. Wife argues that she was not excessively protective of Son and that she simply made herself available in case a crisis occurred during the trip. She points out that Husband had never traveled alone with Son, and Son becomes anxious in outside environments. On the other hand, we recognize that Husband was only traveling from Middle Tennessee to East Tennessee with Son, and Husband's family was present during the visit as well. Even

indicate that he intended to substitute his own personal opinion in place of the directives laid out by the legislature in the statutory best interest factors. A trial court speaks through its written orders, not through oral statements contained in the transcript, so appellate courts review a trial court's written orders. *Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 441 n.21 (Tenn. 2015). We note, however, that we have read the trial judge's oral remarks and do not consider them as indicative of an intent to substitute his judgment for that of the general assembly.

after Husband and Son arrived, Wife insisted on "Facetiming" with Son at least twice a day during the visit, which interfered with Son's time with Husband and his family. Wife also argues that the trial court made an incorrect finding of fact by stating that she suffers from an anxiety disorder when separated from the child. However, when Wife was asked why she decided to follow Husband and Son to East Tennessee, she began her explanation by stating, "I have an anxiety disorder." Having carefully reviewed the testimony, we agree with the trial court's findings that Wife has, on occasion, been excessively protective of Son during Husband's parenting time, and she suffers from an anxiety disorder that affects how she responds to being separated from Son.

Another statutory factor is each parent's disposition "to provide the child with food, clothing, medical care, education and other necessary care." Tenn. Code Ann. § 36-6-106(a)(4). The trial court found that Wife had been voluntarily unemployed for the past four years, and due to Wife's unemployment, the family finances became so strained that Husband was required to work two full time jobs. The court found that Wife was under a "delusion regarding Husband's alleged failure to provide" for the family.[2] The court also found that Wife was "unmotivated to work outside the home" and had "shown no understanding of the absolute need to work outside the home." Wife argues that it is inaccurate and belittling to say that she has been unemployed when she has been caring for Son. She also claims that the parties' financial strain "was in no way caused by" the fact that she did not work outside the home. Considering Wife's unemployment outside the home is not inaccurate or meant to belittle her. The statute requires consideration of Wife's disposition to provide the child with food, clothing, education, medical care, and other necessary care. Thus, Wife's motivation to secure employment and her ability to provide for Son are appropriate factors for consideration. As for the cause of the parties' financial strain, we agree that the parties struggled with debts throughout the marriage, even prior to Wife's decision to stay at home. However, the evidence does not preponderate against the trial court's finding that, due to Wife's continued unemployment, even after Son began preschool, the family finances became so strained that Husband was required to work two full time jobs. It is disingenuous to say that Wife's unemployment in no way caused financial strain for the parties.

---

[2]We reject Wife's assertion that the trial court erred in relying on Exhibit 2 as the basis for its conclusions regarding Wife's spending. Wife testified at trial that she was forced to provide the majority of the groceries for the marital home. She also testified that Exhibit 2 accurately reflected her expenses and summarized what she spent from her accounts between 2012 and 2015. The trial court found that Wife was under a "delusion" that Husband failed to provide for the family and, as an example, noted that Wife's own exhibit demonstrated that she spent only $50 to $100 on food in some months. Given Wife's description of her exhibit, we find no error in the trial court's reliance on the information she provided.

Another factor is "[t]he degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities." Tenn. Code Ann. § 36-6-106(a)(5). The trial court found that Wife performed the majority of the parenting responsibilities due to the fact that Husband worked two full time jobs during most of Son's life. The court found that Husband was perfectly capable of performing parenting responsibilities and had only been limited in this regard due to his past work schedule. The evidence supports these findings. Wife complains that Husband was not "only" limited by his work schedule because he also took time to hunt, fish, and see his paramour when he could have been spending time with Son. However, Husband testified that he had hunted and fished less than ten times over the past four years due to his work schedule, and he spent time with his co-worker paramour, during their very brief relationship, either before he began work for the TWRA in the mornings, during lunch, or after he finished work for Bass Pro Shop late at night, when she would accompany him running errands.[3] The small amount of time Husband spent on these other activities does not lead us to conclude that the trial court erred in finding that Husband is perfectly capable of performing parenting responsibilities and has only been limited in this regard in the past due to his work schedule.

The next factor involves the "love, affection, and emotional ties existing between each parent and the child." Tenn. Code Ann. § 36-6-106(a)(6). The trial court found that both parents have equal love and affection for Son. It noted Wife's testimony that Husband is "a very good father, when he is present." On appeal, Wife "does not deny" these findings but again claims they are one-sided. We discern no error in these findings. Wife acknowledges that this factor does not weigh in favor of either party.

Regarding the "emotional needs and developmental level of the child," Tenn. Code Ann. § 36-6-106(a)(7), the trial court noted Son's weekly therapy for sensory processing disorder and that Son would attend pre-K instead of kindergarten in the coming year. The court found that Son's experiences at his preschool had been very successful in addressing his issues and that it was in Son's best interest to continue attending.

As for the "moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child," the court noted that Wife provides religious instruction for the child, but the court found both parents to be morally fit. We reject Wife's assertion that Husband is not morally fit as a parent simply because he admitted to adultery and/or inappropriate marital conduct. *See Earls v. Earls*, 42 S.W.3d 877, 913

---

[3]According to Husband, his extramarital relationship occurred "after a year's worth of litigation," which would have been around May 2015. By the time of trial in July 2015, the relationship had ended.

n.7 (Tenn. Ct. App. 2000) (rejecting the trial court's conclusion that a parent was somehow "morally unfit" to be the custodial parent because of his relationship with a paramour).

Regarding physical health, the trial court found that Husband enjoys good health while Wife suffered from various injuries and medical conditions. The court noted that Wife takes Percocet/Oxycodone daily for an injury that occurred many years ago. The court found that Wife has suffered from anxiety and depression since the age of 18 and has been treated with various anti-depression and anti-anxiety drugs for the past 14 years.

The trial court also expressed some concern with Wife's alcohol use while caring for Son. It noted that Wife was still responsible for Son's care even though he was sleeping, and the trial court found that Wife's alcohol consumption at the airport was "indicative of a parent more concerned with their own needs than the child's best interests." Wife seems to suggest that the trial court erred in its conclusions regarding these incidents. However, considering the level of medications taken by Wife on a daily basis, the fact that the child comes to Wife's bed every single night, and the fact that he suffers from anxiety in new environments, yet Wife chose to drink when alone with him at an airport, we cannot say that the trial court erred in expressing some concern over these incidents. The court also recognized that Wife's issues with medications had improved. The court recognized that Husband recommended Wife as a babysitter for one of his co-workers with full knowledge of her issues and medications, and Wife performed those duties without incident. The court found that Husband had no pre-divorce complaints about leaving Son in Wife's care.

The best interest analysis also requires consideration of the child's involvement with physical surroundings, school, or other significant activities, Tenn. Code Ann. § 36-6-106(a)(9), and the importance of continuity in the child's life, including the length of time the child has lived in a stable, satisfactory environment, Tenn. Code Ann. § 36-6-106(a)(10). The trial court found that continuity was very important in Son's life and that he is happy and successful at his preschool. Wife argues that the trial court should have noted the importance of continuity for Son related to her role as his primary caregiver. However, the trial court had already acknowledged Wife's role as primary caregiver in its discussion of other factors. With specific regard to continuity and the length of time the child has lived in a stable environment, Husband emphasized that he would be remaining in the marital home, which was the only home Son had known. Wife's plans were unknown at the time of trial, as she testified that she intended to search for a rental home and begin working after the divorce trial. Consequently, we believe the continuity factor does not weigh heavily in Wife's favor, as she suggests.

17

Finally, we consider each parent's employment schedule. Tenn. Code Ann. § 36-6-106(a)(14). The trial court noted that Wife had no current work schedule but most certainly would in the near future. It noted that Wife acknowledged her ability to hold employment and her intention to find a job as soon as possible. The trial court found that Husband's work schedule for his second job would probably have to be reduced to facilitate parenting time. However, the court accredited Husband's testimony regarding his willingness to make those changes and his testimony that he frequently works at home for the TWRA. The court noted Wife's testimony that Husband made himself available when needed in the past. Wife complains that Husband had not reduced his work schedule by the time of the hearing on her post-trial motion, but at the same time, we recognize that Wife was still residing in the marital residence with Husband and Son.

After carefully reviewing all of the applicable statutory factors in conjunction with the trial court's findings, the record does not indicate that the trial court abused its discretion in fashioning a residential parenting schedule for Son in which he would share equal time with Husband and Wife. This arrangement permits both parents to enjoy the maximum participation possible in the life of the child in a manner that is consistent with the statutory factors. *See* Tenn. Code Ann. § 36-6-106. The parenting schedule devised by the court does not fall outside the spectrum of rulings that could reasonably result from applying the correct legal standards to the evidence in the record.

Wife's next argument is that the trial court erred in failing to designate a primary residential parent. The parenting plan stated, "Father shall have responsibility for the care of the child or children except at the following times when the other parent shall have responsibility: The parents shall equally share parenting time exercising an alternating full week-to-week schedule." The parenting plan assigned 182.5 days of parenting time per year for each parent. Another section of the parenting plan stated, "The child is scheduled to reside equal time with each Mother and Father. This parent is designated as the primary residential parent[.]" The plan did not specifically designate either parent as the primary residential parent.

"To allocate parenting responsibilities properly, the court must ensure that each permanent parenting plan designates a primary residential parent *and* establishes a residential parenting schedule." *Armbrister*, 414 S.W.3d at 695 (emphasis added). Tennessee Code Annotated section 36-6-402(5) expressly provides that a parenting plan's residential schedule "shall designate the primary residential parent." *See also Thompson v. Thompson*, No. M2011-02438-COA-R3-CV, 2012 WL 5266319, at *6 (Tenn. Ct. App. Oct. 24, 2012) ("the court must designate a 'primary residential parent'"). In fact, the parenting plan "must designate one parent as the primary residential parent, even where

18

residential time is split evenly." *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at \*10 (Tenn. Ct. App. Oct. 15, 2004) (citing Tenn. Code Ann. § 36-6-402(5); *Hopkins v. Hopkins*, 152 S.W.3d 447 (Tenn. 2004)); *see, e.g.*, *Brown v. Brown*, No. E2011-00421-COA-R3-CV, 2012 WL 1267872, at \*7 (Tenn. Ct. App. Apr. 13, 2012) (explaining that a trial court could not designate both parents as primary residential parent).

Husband argues that it would be arbitrary and unjust to designate one parent as the primary residential parent when both have equal parenting time. He notes that a "primary residential parent" is defined as "the parent with whom the child resides more than fifty percent (50%) of the time." Tenn. Code Ann. § 36-6-402(4). In *Hopkins*, the Tennessee Supreme Court considered this definition and found that it does not preclude a child's residential schedule from being divided equally between the parents. *Hopkins*, 152 S.W.3d at 449. Still, however, the supreme court concluded that the lower court erred in failing to designate a primary residential parent because "Tennessee's statutes require both a residential schedule, see Tenn. Code Ann. § 36-6-404(b) (2001), and the designation of a primary residential parent, see Tenn. Code Ann. § 36-6-402(5) (2001)." *Id.* at 450. We recognized in *Cummings* that when parents have an exactly equal amount of residential parenting time, neither parent actually meets the statutory definition of a primary residential parent. *Cummings*, 2004 WL 2346000, at \*14. Nevertheless, "even though there may be no primary residential parent in fact, the law requires the designation of one parent as the primary residential parent, regardless of the statutory definition." *Id.* The designation of a primary custodian is necessary for state and federal statutes and applicable policies of insurance that may require a determination of custody. *Brown*, 2012 WL 1267872, at \*7. We therefore find it appropriate to remand this case to the trial court for designation of a primary residential parent.

We note that in *Cummings*, which was decided in 2004, this Court concluded that when parents equally share residential time, the trial court should consider the fact that (under the child support guidelines as they existed at that time) only the primary residential parent was entitled to receive child support, and therefore, the trial court should designate the parent with lower income as the primary residential parent to ensure that the child is not deprived of the benefit of support. *Cummings*, 2004 WL 2346000, at \*15. In *Hopkins*, also decided in 2004, the supreme court explained that under the then-existing child support guidelines, a comparative analysis of the parties' earnings was improper, the income of the obligee-recipient could not be considered in calculating child support, and child support could only be awarded to the primary residential parent. *Hopkins*, 152 S.W.3d at 449-50. When *Hopkins* was decided in 2004, however, "the Child Support Guidelines had not yet been amended to adopt the 'income shares approach'" that exists today. *See Merkel v. Merkel*, No. E2014-01888-COA-R3-CV, 2016 WL 1276094, at \*6 (Tenn. Ct. App. Mar. 31, 2016) (*no perm. app. filed*). The

amended guidelines took effect in 2005 and now recognize that a primary residential parent with greater income than the alternate residential parent *may* be required to pay child support to the alternate residential parent to assist with the child's expenses during times spent with the alternate residential parent. *Id.* (citing Tenn. Comp. R. & Regs. 1240-02-04-.04(7)(f)). As a result, the rationale employed by the *Cummings* court for automatically designating the parent with less income as the primary residential parent no longer exists. Accordingly, on remand, the trial court should designate a primary residential parent without regard to the rule of thumb set forth in *Cummings*.

One final note is worth mentioning. During oral argument on appeal, the members of this panel questioned the attorneys about whether the child support worksheets that were attached to the permanent parenting plan included a box that designated either Husband or Wife as the primary residential parent. Upon review of the worksheets, the parties acknowledged that the box designating the "PRP" had an "X" next to the space for Wife. However, counsel for Husband explained that the attorneys did not fill in that box. He stated that the automated computer program fills in the box automatically based on the number of days allocated to each parent. According to counsel, when parents equally share parenting time at 182.5 days each, the computer, by default, designates the mother of the child as the primary residential parent rather than the father, and that default designation cannot be changed. Wife's counsel acknowledged that the worksheet, by default, deems the mother to be the primary residential parent. Thus, it is clear that the computer worksheet designated Wife as the primary residential parent, not the attorneys or, more importantly, the trial court. We have often said that parenting decisions are among the most important decisions confronting the courts. *See, e.g.*, *In re T.R.Y.*, No. M2012-01343-COA-R3-JV, 2014 WL 586046, at \*11 (Tenn. Ct. App. Feb. 12, 2014); *Shofner v. Shofner*, 181 S.W.3d 703, 715 (Tenn. Ct. App. 2004). We decline to recognize the designation automatically generated by the child support worksheet as controlling when the trial court did not name a primary residential parent in the divorce decree or permanent parenting plan. The trial court is not bound by the designation in the child support worksheet on remand.[4]

---

[4]We also encourage the Department of Human Services to review the computer program that generates the child support worksheets to determine whether the program automatically requires designation of the mother as primary residential parent, without an option for alteration, in situations involving equal parenting time. We presume that the automatic selection of Wife as primary residential parent was due to the following provision found in the child support guidelines:

(iii) Fifty-fifty/Equal Parenting.

(I) Except as provided below in item (iii)(II) and subpart (iv), the Mother assumes the role of PRP for all children in fifty-fifty/equal parenting situations for purposes of calculating the BCSO, therefore, the BCSO for these children shall be entered in the Mother's column.

## E.  Child Support

Wife's next argument on appeal is that the trial court erred in imputing income to her for purposes of calculating child support.  The child support guidelines provide that imputing gross income to a parent is appropriate if a parent is determined to be willfully and/or voluntarily underemployed or unemployed.  Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(I).  This provision "'is designed to prevent parents from avoiding their financial responsibility to their children by unreasonably failing to exercise their earning capacity.'"  *Tidwell v. Tidwell*, No. M2015-00376-COA-R3-CV, 2016 WL 423771, at \*4 (Tenn. Ct. App. Feb. 2, 2016) (*no perm. app. filed*) (quoting *Wheeler v. Wheeler*, No. M2012-02154-COA-R3-CV, 2014 WL 1512828, at \*6 (Tenn. Ct. App. Apr. 15, 2014)).  It allows a court to use a party's potential income, or earning capacity, if the court finds the party is willfully or voluntarily underemployed.  *Cisneros v. Cisneros*, No. M2013-00213-COA-R3-CV, 2015 WL 7720274, at \*11 (Tenn. Ct. App. Nov. 25, 2015) (*no perm. app. filed*).  The guidelines do not presume that any parent is willfully or voluntarily unemployed.  Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii).  The purpose of the inquiry is to ascertain the reasonableness of the parent's occupational choices in light of the parent's obligation to support his or her child and to determine whether such choices benefit the children.  *Id.*  A finding of willful or voluntary unemployment is not limited to choices motivated by an intent to avoid or reduce child support payments; it may be based on any intentional choice or act that adversely affects a parent's income.  *Id.*  Factors that may be considered include the parent's past and present employment and his or her education, training and ability to work.  Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii).  The guidelines also recognize the role of a stay-at-home parent as an important and valuable factor in a child's life, and in considering whether to impute income to a stay-at-home parent, the court must consider (1) whether the parent acted in the role of full-time caretaker while the parents lived in the same household, (2) the length of time the stay-at-home parent has remained out of the workforce for that purpose, and (3) the age of the minor children. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii)(III).

---

> (II) When calculating support in a fifty-fifty/equal parenting situation in conjunction with a standard parenting situation, the BCSO for the child(ren) in the fifty-fifty/equal parenting situation will be assigned to the Father in situations where he is the PRP for all other children in the case under consideration.

Tenn. Comp. R. & Regs. 1240-02-04-.08(2)(c)(1)(iii).  Regardless of the effect of this guideline on the calculation of child support, we believe that the automated selection by the computer worksheet cannot trump the trial court's designation of primary residential parent, and the computer worksheet's automatic selection is not controlling in the absence of any indication that the issue was actually addressed by the trial judge.

We review a finding of voluntary unemployment with the following principles in mind:

> "'Determining whether a parent is willfully and voluntarily underemployed and what a parent's potential income would be are questions of fact that require careful consideration of all the attendant circumstances.'" *Reed v. Steadham*, No. E2009-00018-COA-R3-CV, 2009 WL 3295123, at *2 (Tenn. Ct. App. Oct. 14, 2009) (quoting *Owensby* [*v. Davis*, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4 (Tenn. Ct. App. July 31, 2008)]). The trial court has considerable discretion in its determination of whether a parent is willfully or voluntarily underemployed. *Hommerding v. Hommerding*, No. M2008-00672-COA-R3-CV, 2009 WL 1684681, at *7 (Tenn. Ct. App. June 15, 2009) (citing *Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002)); see also *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001). A trial court's determination regarding willful and voluntary underemployment is entitled to a presumption of correctness, *Johnson v. Johnson*, No. M2008-00236-COA-R3-CV, 2009 WL 890893, at *7 (Tenn. Ct. App. April 2, 2009), and "we accord substantial deference to the trial court's decision, especially when it is premised on the trial court's singular ability to ascertain the credibility of the witnesses." *Reed*, 2009 WL 3295123, at *2.

*State ex rel. Brown v. Brown*, No. M2014-02497-COA-R3-CV, 2016 WL 506732, at *4 (Tenn. Ct. App. Feb. 8, 2016) (*no perm. app. filed*) (quoting *Pace v. Pace*, No. M2009-01037-COA-R3-CV, 2010 WL 1687740, at *8 (Tenn. Ct. App. Apr. 26, 2010)).

The trial court found that Wife was voluntarily unemployed for the past four years and that her job at HCA paid approximately eighteen dollars an hour. The trial court also found that Wife had prior successful employment as an executive administrative assistant for a radiology group in Texas where she earned ten dollars an hour. The court found that Wife left her outside employment and became a stay-at-home caregiver when Son was eleven months old by agreement with Husband, but she remained unemployed even when Son attended a private preschool two or three days per week for the last two years. As noted above, the trial court found that Wife's unemployment caused the family finances to become so strained that Husband had to work two full-time jobs, and the parties still had a negative net worth at the time of trial. The trial court found that Wife had recently submitted resumes for employment and acknowledged her ability to hold employment outside the home but was unmotivated to work and had shown no understanding of the absolute need for her to work outside the home. The court found it necessary for Wife to work full-time. The trial court calculated child support using

Husband's income from the TWRA and Bass Pro Shop, and it imputed income to Wife at $1,733.33 per month based on employment at ten dollars an hour. This resulted in Husband paying Wife $575 in child support per month.

On appeal, Wife argues that the trial court should not have found her voluntarily unemployed because the parties agreed that she would be a stay-at-home mother. She appears to argue that the trial court should not have imputed *any* income to her when calculating child support. This was not Wife's position at trial, however. She testified that she intended to re-enter the workforce and obtain a full-time job when the divorce proceeding concluded, and she claimed that she was "receiving phone calls on my resume as we speak." Wife testified that she intended to work in the medical field as an administrative assistant or officer manager. In Wife's proposed parenting plan, she listed her gross monthly income as $1,256.66 for purposes of calculating child support (apparently calculated based on wages of $7.25 an hour and 40-hour work-weeks). She also concedes on appeal that she has an earning capacity of "approximately 2/3 of Husband's current income."

Considering Wife's testimony and proposals at trial, her age and experience, the fact that she was earning eighteen dollars an hour just four years prior to trial, and the fact that Son was scheduled to begin pre-K full-time in the month after trial, we discern no error in the trial court's decision to impute income to Wife at a wage of ten dollars per hour rather than the $7.25 wage she proposed.

Finally, with regard to child support, Wife challenges the trial court's decision to require her to pay one-half of Son's private preschool tuition at Mount Juliet Christian Academy rather than her pro rata share based on her income. Again, the trial was held in July 2015. The parties mutually agreed that Son would begin full-time pre-K, five full days a week, in August 2015. The trial court found that Son's experiences at the school were very successful in addressing his issues and that it was in his best interest to continue attending. Beginning August 1, the cost would be $508 per month for the basic preschool tuition and $180 per month for extended care if the parents needed to take Son to school early or pick him up late. Husband testified that he believed extended care would be necessary because both he and Wife would be working. The trial court likewise found that the cost of after school care was necessary for both parties to work outside the home. The trial court ordered the parties to equally share the total cost of $688 per month.

On appeal, Wife argues that the trial court erred in its decision regarding these expenses, citing a section of the child support guidelines that addresses work-related childcare expenses. The guidelines provide that work-related childcare costs "shall be included in the calculations to determine child support" and "shall be divided between the

parents pro rata" based on the income of each parent. Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(a)(1), (3). "[W]ork-related childcare costs mean expenses for the care of the child for whom support is being determined which are due to employment of either parent or non-parent caretaker." Tenn. Comp. R. & Regs. 1240-02-04-.02(29).

In contrast, the child support guidelines address "extraordinary educational expenses" in another section. Extraordinary educational expenses include, but are not limited to, "tuition, room and board, fees, books, and other reasonable and necessary expenses associated with special needs education or private elementary and secondary schooling." Tenn. Comp. R. & Regs. 1240-02-04-.03(6)(b)(5). These expenses are considered on a case-by-case basis in the calculation of support and may be added to the presumptive child support order as a deviation. Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d). "A trial court may order an upward deviation from the Guidelines for extraordinary educational expenses which include tuition and other expenses associated with private school attendance." *Beyer v. Beyer*, 428 S.W.3d 59, 74 (Tenn. Ct. App. 2013). Decisions regarding extraordinary expenses and private school tuition are very fact specific. *Carlson v. Carlson*, No. E2007-01276-COA-R3-CV, 2008 WL 4735307, at *6 (Tenn. Ct. App. Oct. 27, 2008). "These expenses may be, but are not required to be, divided between the parents according to each parent's [percentage of income]." Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d). The use of the term "'may' grants the trial court discretion in determining payment of private school tuition." *Martin v. Martin*, No. W2014-01007-COA-R3-CV, 2015 WL 2400583, at *6 (Tenn. Ct. App. May 20, 2015) (*no perm. app. filed*) (citing *Johnson v. Johnson*, No. M2008-00236-COA-R3-CV, 2009 WL 890893, at *10 (Tenn. Ct. App. Apr. 2, 2009)); *see also Massey v. Casals*, 315 S.W.3d 788, 797 (Tenn. Ct. App. 2009) ("The award of such deviation is within the discretion of the tribunal.") "Trial courts have discretion in deciding whether to impose the extraordinary expense of private school tuition on a party." *Johnson*, 2009 WL 890893, at *11. A trial court can order payment of less than the full amount of a child's extraordinary educational expenses depending on the proof in a particular case. *Martin*, 2015 WL 2400583, at *7. The trial court is required to calculate the extraordinary educational expenses separately and to add them to the base child support award. *In re Andrea A.R.*, No. M2011-00574-COA-R3-JV, 2012 WL 397475 at *7 (Tenn. Ct. App. Feb. 7, 2012). "If a deviation is allowed for extraordinary educational expenses, a monthly average of these expenses shall be based on evidence of prior or anticipated expenses and entered on the Worksheet in the deviation section." Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)(1)(iii).

In *Lubell v. Lubell*, No. E2014-01269-COA-R3-CV, 2015 WL 7068559, at *20 (Tenn. Ct. App. Nov. 12, 2015) (*no perm. app. filed*), this Court considered how to treat private academy schooling expenses for a fourteen-year-old child with autism. We concluded that the trial court erred in treating the costs as "work-related childcare

expenses" rather than "extraordinary educational expenses." *Id.* at *21. Therefore, we remanded for recalculation of the child support obligation using the correct procedures. *Id.*

In *Rucker v. Harris*, No. M2013-01240-COA-R3-JV, 2014 WL 3530851, at *6 (Tenn. Ct. App. July 15, 2014), *perm. app. denied* (Tenn. Nov. 21, 2014), the parties' five-year-old twins were enrolled in a pre-K program at a private school at a cost of $45 per child per week, and the trial court included that cost in the child support worksheet as "work-related childcare." Even though the children were enrolled in a program at a private school and the cost of that program was billed as tuition, we held that the trial court did not err in characterizing the cost as a work-related childcare expense, rather than an extraordinary educational expense, because the nature of the program and its cost were "not so different from what parents ordinarily encounter when arranging daycare for children who have not yet reached school age." *Id.*

Here, the issue is more difficult because Son is attending a private preschool that addresses his special developmental needs, but a portion of the total cost is attributable to aftercare expenses that are necessary due to the parties' employment. After carefully reviewing the facts and the parties' arguments, we cannot say that the trial court erred in treating Son's basic private preschool tuition cost of $508 per month as an extraordinary educational expense and calculating it separately from the base child support award. Work-related childcare costs are "expenses for the care of the child . . . which are due to employment of either parent." Tenn. Comp. R. & Regs. 1240-02-04-.02(29). Son has historically attended preschool at Mount Juliet Christian Academy not because the parties needed care for the child due to employment, but, as Wife testified, "To get him ready to go into pre-K, to get him socialized and ready for school." Son attended even though Wife was unemployed. Considering the specific facts of this case, the trial court did not abuse its discretion in its allocation of the basic preschool tuition cost equally between the parties. *See Johnson*, 2009 WL 890893, at *11; *Carlson*, 2008 WL 4735307, at *7. However, we conclude that the portion of the monthly preschool cost that is clearly traceable to providing "extended care" for Son before and after school should be treated as a work-related childcare cost on the child support worksheet. As the trial court recognized, this sum was necessary to enable both parents to work outside the home. It therefore qualifies as a work-related childcare expense "for the care of the child . . . due to employment of either parent." Tenn. Comp. R. & Regs. 1240-02-04-.02(29). On remand, the trial court should modify the child support worksheet to classify the monthly extended care expense of $180 as a work-related childcare expense and recalculate the child support award accordingly.

Wife also references the fact that Son's private preschool costs had not actually been incurred at the time of trial. She claims that "[o]nly amounts actually paid are

25

included in the calculation," citing Tenn. Comp. R. & Regs. 1240-02-04-.08(2)(d)(1)(iii). The full text of that section, however, provides: "Only amounts actually paid are included in the calculation. Payments that are made by a parent's employer, but not deducted from the parent's wages, shall not be included." *Id.* The quoted section did not prevent the trial court from addressing the monthly educational expense that both parties agreed they would begin incurring two weeks after the trial ended. Wife admits that the amount mentioned in the trial court's order "is the anticipated amount for the following school year." The guidelines specifically authorize the court to base the award "on evidence of prior *or anticipated* expenses[.]" Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)(1)(iii) (emphasis added). This argument is meritless.

Wife also argues that Husband should have been responsible for paying the full cost of Son's preschool because he was the only one working at the time of trial. However, as noted throughout this opinion, Wife consistently represented to the trial court that she intended to get a full-time job when the divorce proceeding ended. The trial court was justified in concluding that extended care at the preschool was necessary due to the fact that both parents would be working after trial.

For the aforementioned reasons, we affirm the trial court's imputation of income to Wife for the purposes of calculating child support, and we affirm the trial court's order requiring the parties to equally share the cost of Son's basic private preschool tuition. However, we note that the child support worksheets attached to the divorce decree do not mention the obligation regarding educational expenses. "If a deviation is allowed for extraordinary educational expenses, a monthly average of these expenses shall be . . . entered on the Worksheet in the deviation section." Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)(1)(iii). On remand, the trial court should modify the child support worksheets to include the entry for extraordinary educational expenses. It should also re-classify the extended care expense as a work-related childcare cost and recalculate the child support award in accordance with that classification.

### F. Attorney's Fees

Finally, Wife argues that the trial court should have awarded her attorney's fees in the amount of $7,000, which she claims she incurred solely due to the issues involving Husband's paramour. Again, Wife filed her amended complaint alleging adultery one year into the litigation and one month prior to trial. Husband immediately filed an answer admitting to adultery. At trial, Wife testified that she was seeking an award of approximately $7,000 in attorney's fees "as a result of the paramour." The trial court found that Wife's testimony about her attorney's fees was insufficient to establish any specific amount because her estimate that she had incurred "[a]pproximately 7,000" was speculative. "In any event," the court continued, "given the amount of marital debt and

26

child support for which Husband is now obligated, Husband is unable to pay anyway." The trial court ordered both parties to be responsible for their own attorney's fees. Whether to award attorney's fees in a divorce proceeding is in the discretion of the trial court and is reviewed under an abuse of discretion standard. *Morgan v. Krauss*, No. M2014-02035-COA-R3-CV, 2015 WL 5936918, at \*4 (Tenn. Ct. App. Oct. 12, 2015). The trial court did not abuse its discretion in its decision. We respectfully deny Wife's request for attorney's fees on appeal.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the general sessions court is hereby affirmed in part, reversed in part, and remanded for further proceedings. Specifically, we reverse and remand for designation of a primary residential parent and for modification of the child support worksheets to reflect the educational expenses and work-related childcare costs. Costs of this appeal are taxed to the appellant, Jennifer Rebecca Creswell Henegar, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE